IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHILIP ADAMO; JAMES BEADNELL; JOY BEADNELL; JAMES BISHOP; LISA BISHOP; PATRICIA BEEN; KEITH BEEN; MERCEDES BEEN; KRISTINA BOHANNON; PLAINTIFF I.B.F.; PLAINTIFF I.B.M.; STEPHANIE BRIONES; PLAINTIFF J.B.; LYNSEY CALLAHAN; TONI CORDOVA; JOHN CORTINA; JILL CORTINA; SIRO CORTINA; ITALIA CORTINA; GINA DECOTIIS; MARK DECOTIIS; ADAM DIBLE; LINDA DURKIN; CAROL E. EMERSON; ROSS FREDERICKSON; EUGENE GNIDOVEC; KIMBERLY BUNDRIDGE; MICHAEL GNIDOVEC; ELIZABETH GNIDOVEC; PHIL HEIDRICK; MARY HELTON; JOHN HELTON; PLAINTIFF D.H.; PLAINTIFF B.H. ; SHERYL HUGHES; BRADLY HUGHES; JEANNETTE HYATT; KEVIN HYATT; SHANNON HYATT; MARGARET HYATT; JAMES HYATT; CHASTITY JOHNSON; JEREMY JOHNSON;  PLAINTIFF D.J.;  PLAINTIFF S.J.; MICHAEL KILLUPS; LISA KILLUPS; ANGELA KING; STEVEN KING; DAMON LAFORCE; RONALD LECOMTE; CYNTHIA LECOMTE; MICHAEL LEZON; CHRIS LONG; MEAGAN LONG;; CAROLYN LUBKER; JAMES MATTHEWS; SCOTT PATRICK; MELISSA PATRICK; GARRETT RAWINSKY; JON RAWINSKY; ANNE MARYE BRODBECK; COURTNEY REDDICK; MEGAN SHEFKE; DAVID SHEFKE; LINDA STRANGE; DOUGLAS STRANGE; MICHAEL SICO; JOANNE SICO; BRADFORD STEVENS; TERESA VIERS; EDDIE VIERS; JOSEPH WALLACE; JEANNE WALLACE; WILLETTE TOBY WEHUNT; DAVID WEHUNT; SHASHONE WEISE; DAVID WEISE; PLAINTIFF B.W.; JOANNE WERSTLEIN; THOMAS WERSTLEIN; TRINA WILKINS; PLAINTIFF N.L.; SANDRA WILKINS; LAURA WINCHESTER; JASON WROBLESKI; and MARC WROBLESKI;<br><br>        PLAINTIFFS<br><br>                        v.<br><br>GENZYME CORPORATION; and MOUNT SINAI SCHOOL OF MEDICINE.<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>COMPLAINT</u>

AND NOW come Plaintiffs, by and through their attorneys, and file this Complaint.

In support thereof, Plaintiffs aver as follows:

<u>PARTIES</u>

1.    Plaintiff Philip Adamo is an adult individual who currently resides in Southbury, CT. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

2.    Plaintiff Patricia Been is an adult individual who currently resides in Campbellsburg, IN. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

3.    Plaintiff Keith Been is an adult individual who currently resides in Campbellsburg, IN and is the spouse of Patricia Been.

4.    Plaintiff Mercedes Been is an adult individual who currently resides in Charlestown, IN. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

5.    Plaintiff James Beadnell is an adult individual who currently resides in Avondale, AZ. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009,

but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

6.      Plaintiff Joy Beadnell is an adult individual who currently resides in Marysville, WA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

7.      Plaintiff James Bishop is an adult individual who currently resides in Westfield, MA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

8.      Plaintiff Lisa Bishop is an adult individual who currently resides in Westfield, MA and is the spouse of James Bishop.

9.      Plaintiff Kristina Bohannon is an adult individual who currently resides in Sellersburg, IN.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

10.     Plaintiff I.B.M., ("Plaintiff I.B.M.") is a minor, by and through guardian Kristina Bohannon who currently resides in Sellersburg, IN.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been

forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place Plaintiff at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

11.     Plaintiff I.B.F., ("Plaintiff I.B.F") is a minor, by and through guardian Kristina Bohannon who currently resides in Sellersburg, IN.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place Plaintiff at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

12.     Plaintiff J.B. ("Plaintiff J.B.") is a minor, by and through guardians Rosa and Juan Briones of San Pedro, CA.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place Plaintiff at the end of a secret waiting list for access to Fabrazyme if the unapproved and untested dose was refused.  Although Plaintiff J.B. has received a donation of drug from his sibling, Plaintiff has still not been able to obtain full FDA-approved doses due to the sporadic shipping and inconsistent allocation of drug under the Genzyme Rationing Plan.

13.     Plaintiff Stephanie Briones is an adult individual who currently resides San Pedro, CA and is the daughter of Rosa and Juan Briones.  Plaintiff was on treatment with Fabrazyme prior to June 2009, but since this date has donated her entire allocation to her sibling, Plaintiff J.B.  Ms. Briones was not treated for her disease as of June 2009.

14.     Plaintiff Lynsey Callahan is an adult individual who currently resides in Richmond, VA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009,

but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

15.   Plaintiff Toni Cordova is an adult individual who currently resides in Reno, NV.  Plaintiff was banned treatment with Fabrazyme until January 2009, and since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

16.   Plaintiff John Cortina is an adult individual who currently resides in Brewster, NY. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

17.   Plaintiff Jill Cortina is an adult individual who currently resides in Brewster, NY and is the spouse of John Cortina.

18.   Plaintiff Siro Cortina is an adult individual who currently resides in South Salem, NY. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

19.   Plaintiff Italia Cortina is an adult individual who currently resides in South Salem, NY and is the spouse of Siro Cortina.

20.   Plaintiff Adam Dible is an adult individual who currently resides in Fremont, OH.

Plaintiff was not treated with Fabrazyme prior to June 2009, and Defendants have since denied him access to Fabrazyme.

21.     Plaintiff Gina DeCotiis is an adult individual who currently resides in Tempe, AZ. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date, she has been forced to receive injections of non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

22.     Plaintiff Mark Decotiis is an adult individual who currently resides in Tempe, AZ and is the spouse of Gina Decotiis.

23.     Plaintiff Linda Durkin is an adult individual who currently resides in Peoria, IL.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

24.     Plaintiff Carol Emerson is an adult individual who currently resides Albuquerque, NM. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

25.     Plaintiff Ross Frederickson is an adult individual who currently resides in Ft. Wayne, IN. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for

access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

26. Plaintiff Eugene Gnidovec is an adult individual who currently resides in Collins, OH. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

27. Plaintiff Kimberly Bundridge is an adult individual who currently resides in Collins, OH and is the spouse of Eugene Gnidovec.

28. Plaintiff Michael Gnidovec is an adult individual who currently resides in Cleveland, OH. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

29. Plaintiff Elizabeth Gnidovec is an adult individual who currently resides in Cleveland, OH and is the spouse of Michael Gnidovec.

30. Plaintiff Phil Heidrick is an adult individual who currently resides in McKinleyville, CA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

31. Plaintiff Mary Helton is an adult individual who currently resides Clinton, IN.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme

under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused. Genzyme refused to allow Mrs. Helton to donate her dose to her child, unlike other families.

32.     Plaintiff John Helton is an adult individual who currently resides in Cleveland, OH and is the spouse of Mary Helton.

33.     Plaintiff D.H. ("Plaintiff D.H.") is a minor, by and through guardians Mary and John Helton who currently resides in Clinton, IN. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place Plaintiff at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

34.     Plaintiff Sheryl Hughes is an adult individual who currently resides in Durham, NC. Plaintiff was not on treatment with Fabrazyme prior to June 2009, so when treatment was prescribed, Defendants' banned her from access to Fabrazyme.

35.     Plaintiff Bradley Hughes is an adult individual who currently resides Durham, NC and is the spouse of Sheryl Hughes.

36.     Plaintiff B.H. ("Plaintiff B.H.") is a minor, by and through guardians Sheryl and Bradley Hughes who currently resides in Durham, NC. Plaintiff was banned access to Fabrazyme from 2009 until February 2011, and since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place Plaintiff at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

37.     Plaintiff Margaret Hyatt is an adult individual who currently resides in Royal Oak, MI. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

38.     Plaintiff James Hyatt is an adult individual who currently resides in Royal Oak, MI and is the spouse of Margaret Hyatt.

39.     Plaintiff Jeanette Hyatt is an adult individual who currently resides in Royal Oak, MI. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

40.     Plaintiff Kevin Hyatt is an adult individual who currently resides in Hazel Park, MI. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

41.     Plaintiff Shannon Hyatt is an adult individual who currently resides in Hazel Park, MI and is the spouse of Kevin Hyatt.

42.     Plaintiff Chastity Johnson is an adult individual who currently resides in Wise, VA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for

access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

43.    Plaintiff Jeremy Johnson is an adult individual who currently resides in Wise, VA and is the spouse of Chastity Johnson.

44.    Plaintiff D.J. ("Plaintiff D.J.") is a minor, by and through guardians Chastity and Jeremy Johnson, who currently resides in Wise, VA.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place Plaintiff at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

45.    Plaintiff S.J. ("Plaintiff S.J.") is a minor, by and through guardians Chastity and Jeremy Johnson, who currently resides in Wise, VA.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place Plaintiff at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

46.    Plaintiff Michael Killups is an adult individual who currently resides in Westfield, MA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

47.    Plaintiff Lisa Killups is an adult individual who currently resides Westfield, MA and is the spouse of Michael Killups.

48.    Plaintiff Angela King is an adult individual who currently resides in Coxs Creek, KY.

Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

49. Plaintiff Steven King is an adult individual who currently resides Coxs Creek, KY and is the spouse of Angela King.

50. Plaintiff Damon LaForce is an adult individual who currently resides in Oakton, VA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

51. Plaintiff Ronald LeComte is an adult individual who currently resides in Lily, PA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

52. Plaintiff Cynthia LeComte is an adult individual who currently resides Lily, PA and is the spouse of Ronald LeComte.

53. Plaintiff Michael Lezon is an adult individual who currently resides Broad Brook, CT. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

54. Plaintiff Chris Long is an adult individual who resided in Omaha, NE at the times of injury for purposes of *lex loci delecti*. He is now a resident of Okalusa, IA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

55. Plaintiff Meagan Long is an adult individual who currently resided in Omaha, NE.  She now resides in Okalusa, IA and is the spouse of Chris Long.

56. Plaintiff Carolyn Lubker is an adult individual who currently resides in Woodbury, MN. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

57. Plaintiff James Matthews is an adult individual who currently resides in Indian Trail, NC. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

58. Plaintiff Scott Patrick is an adult individual who currently resides in Hamilton, OH. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

59.     Plaintiff Melissa Patrick is an adult individual who currently resides in Hamilton, OH and is the spouse of Scott Patrick.

60.     Plaintiff Garrett Rawinsky is an adult individual who currently resides in El Cajon, CA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

61.     Plaintiff Jon Rawinsky is an adult individual who currently resides in Sunnyvale, CA Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

62.     Plaintiff Anne Marye Brodbeck is an adult individual who currently resides in Sunnyvale, CA and is the spouse of Jon Rawinsky.

63.     Plaintiff Courtney Reddick is an adult individual who currently resides in Simi Valley, CA.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

64.     Plaintiff Megan Shefke is an adult individual who currently resides in Livonia, MI. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for

access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

65.     Plaintiff David Shefke is an adult individual who currently resides in Livonia, MI and is the spouse of Megan Shefke.

66.     Plaintiff Bradford Stevens is an adult individual who currently resides in Supply, NC. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

67.     Plaintiff Linda Strange is an adult individual who currently resides in Fairdale, KY. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

68.     Plaintiff Douglas Strange is an adult individual who currently resides Fairdale, KY and is the spouse of Linda Strange.

69.     Plaintiff Michael Sico is an adult individual who currently resides Southwick, MA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

70.     Plaintiff Joanne Sico is an adult individual who currently resides in Southwick, MA and is the spouse of Michael Sico.

71.     Plaintiff Teresa Viers is an adult individual who currently resides in Grundy, VA.

Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009. After June 2009, and despite Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused, Plaintiff applied for and was accepted into a clinical trial for Replagal. Plaintiff then switched to Replagal, but had an adverse reaction to it, and so had to discontinue this treatment. After this time, Plaintiff attempted to return to a Fabrazyme treatment regimen; however, Defendants placed her at the end of the secret waiting list and she received no treatment, consistent with Genzyme's rationing policy.

72. Plaintiff Eddie Viers is an adult individual who currently resides in Grundy, VA and is the spouse of Teresa Viers.

73. Plaintiff Joseph Wallace is an adult individual who currently resides in Richmond, VA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

74. Plaintiff Jeanne Wallace is an adult individual who currently resides in Richmond, VA and is the spouse of Joseph Wallace.

75. Plaintiff Willette Toby Wehunt is an adult individual who currently resides in Central, SC.  Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

76.  Plaintiff David Wehunt is an adult individual who currently resides in Central, SC and is

the spouse of Willette Toby Wehunt.

77.     Plaintiff Shoshone Weise is an adult individual who currently resides Simi Valley, CA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

78.     Plaintiff David Weise is an adult individual who currently resides in Simi Valley, CA and is the spouse of Shoshone Weise.

79.     Plaintiff B.W. ("Plaintiff B.W.") is a minor, by and through guardians Joanne Werstlein and Thomas Werstlein, who currently resides in Vista, AZ. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place Plaintiff at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

80.     Plaintiff Trina Wilkins is an adult individual who currently resides in Carrolton, KY. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

81.     Plaintiff N.L. ("Plaintiff N.L.") is a minor, by and through guardian, Trina Wilkins who currently resides in Carrolton, KY.     Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place Plaintiff

at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

82.   Plaintiff Sandra Wilkins is an adult individual who currently resides in Jeffersonville, IN. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

83.   Plaintiff Laura Winchester is an adult individual who currently resides in Phoenix, AZ. Plaintiff was banned access to Fabrazyme from September 2009 until January 2011, and since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place her at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

84.   Plaintiff Jason Wrobleski is an adult individual who currently resides in Ashland, MA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

85.   Plaintiff Marc Wrobleski is an adult individual who currently resides in Westfield, MA. Plaintiff was on treatment with FDA-approved doses of Fabrazyme prior to June 2009, but since this date has been forced to be injected with non FDA-approved doses of Fabrazyme under Defendants' threat to place him at the end of a secret waiting list for access to Fabrazyme during its shortage if the unapproved and untested dose was refused.

86.   Defendant Genzyme Corporation, a Sanofi company, ("Genzyme") is a corporation

organized and existing under the laws of the State of Massachusetts, with its headquarters and principal place of business located at 500 Kendall Street, Cambridge, MA 02142, and doing business within New York and elsewhere in the United States.   Defendant Genzyme Corporation is a wholly owned subsidiary of Sanofi, a French Corporation.

87.   Defendant Mount Sinai School of Medicine ("Mount Sinai") is a corporation organized and existing under the laws of the State of New York, with its headquarters and principal place of business located at One Gustave L. Levy Place, New York, NY 10029-6574. Mount Sinai holds limited title to, and is the sole licensor of, U.S. Patent No. 5,356,804 to Genzyme for the manufacture of Fabrazyme.   Mt. Sinai independent of its role as a regional hospital is a global market participant in the treatment of Fabry disease in that it exercises a global monopoly over the sale, distribution, use, and supply of Fabrazyme as well as a regional monopoly over the sale, distribution, use, and supply of the sole treatment alternative, Replagal®, licensed only in Europe.

<u>JURISDICTION AND VENUE</u>

88.   Jurisdiction is conferred upon this judicial district pursuant to federal question jurisdiction under 28 U.S.C. §1331.

89.   This Court also has diversity jurisdiction over the Classes (as hereinafter defined) pursuant to 28 U.S.C. §§ 1332(d) (2) and (6) of the Class Action Fairness Act of 2005, because one or more members of the Classes are citizens of a State different from one or more Defendants, and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

90.   The United States District Court for the District of Massachusetts also has direct jurisdiction over the instant case because Mount Sinai and Genzyme expressly provided

for such jurisdiction in their license agreement to provide Fabrazyme® to Fabry patients as intended third party beneficiaries. Specifically, the Defendants' license agreement provides that Mount Sinai licenses the patent to Fabrazyme® so that it will be "developed and made available for general use to patients for the treatment of Fabry Disease, and for these purposes in willing to grant an exclusive license to GENZYME upon the terms and conditions set forth below." *See* Genzyme-Mount Sinai license agreement attached hereto and incorporated herein as Exhibit A. The license agreement according to its terms is to be interpreted under New York Law, which does not bind non-signatories to arbitration absent narrow exceptions, which exceptions are not present here. The provisions of the license agreement are severable, and the benefits of the contract including consent to jurisdiction in the United States District Court for the District of Massachusetts inure to the intended third-party beneficiaries named as Plaintiffs in this Complaint.

91. Furthermore, Defendants Genzyme and Mount Sinai have sufficient contacts within the state of Massachusetts and have purposely availed themselves to conduct business within the state, as to permit the Federal District Court of Massachusetts to exercise personal jurisdiction over Mount Sinai.

92. Genzyme is a corporation registered to do business in the state of Massachusetts.

93. Mount Sinai, through business conducted within Massachusetts, derives revenues from Massachusetts citizens and corporations. Mount Sinai also solicits and has solicited Massachusetts residents for testing at Mt. Sinai and has caused them to enter New York to take part in Mount Sinai's clinical trials for Fabrazyme® and its Fabry genetic testing program.

94. Mount Sinai holds personal medical records for Massachusetts residents and has

systematically transported and caused to be transported medical samples and medical information of Massachusetts residents across various state jurisdictions including between New York and Massachusetts.  Massachusetts-licensed professionals and their patients have relied on the judgment and consultations of Mount Sinai physicians for treatment of  Massachusetts residents.

95.     Mount Sinai advertises the availability of its testing facility and services to Massachusetts residents, and throughout the country.

96.     Mount Sinai has initiated patent infringement lawsuits in various jurisdictions throughout the United States and Europe affecting or threatening to affect the individual public health and welfare of Massachusetts state citizens being treated for Fabry disease within the jurisdiction of this court and by Massachusetts licensed professionals.

97.     Mount Sinai also systematically transacts business, derives revenues, and transports or caused to be transported tissue samples and medical information of Massachusetts residents as a named business partner of GNS Healthcare, which is a private Massachusetts corporation.

98.     Additional out-of-state Plaintiffs join the instant case under the Rule 20(a)(1)(A) and (B) of the Federal Rules of Civil Procedure, as all injuries arose from a fact common to all Plaintiffs and present a common question of law.

## FACTUAL BACKGROUND

99.     The instant case arises from Defendants' actions to prevent certain patients in the United States from obtaining the full United States Food and Drug Administration ("FDA") approved and recommended dose of Fabrazyme® for treatment of Fabry disease (diluted in certain instances to only 30% of the approved and recommended dose), and banning

the remaining U.S. Fabry patients from receiving Fabrazyme® treatment.

100.    Genzyme placed U.S. Fabry patients on a secret waiting list, ranking them by name, for

future access to Fabrazyme. Genzyme's secret waiting list is not reviewed by the FDA,

state public health authorities, or subject to judicial review.

101.    As a result of the dilution and ban of access to Fabrazyme® in the U.S. (but not

overseas), Fabry patients throughout America have suffered grave bodily harm from the

dilution of the domestic drug supply.

102.    Despite the U.S. shortage, Genzyme provided full FDA-approved doses of Fabrazyme®

to its European patients, and continued to expand the overseas market to include more

European Fabry patients who were given full doses instead of Americans.

103.    Fabry Disease is a heritable genetic illness and results in the body being unable to

synthesize the enzyme alpha-galactosidase A, which is critical for the degradation and

export of fats from cells.

104.    Fabry Disease is a life-threatening illness and without treatment results in the premature

death of Fabry patients from complications such as renal disease, heart attack, and stroke.

105.    Left untreated, Branton *et al.*, "Natural History and Treatment of Renal Involvement in

Fabry Disease;" J. Am. Soc. Nephrol. 13:S139-S143 (2002) found from survival analysis

that 50% of patients developed End Stage Renal Disease "ESRD" by 53 years, with a

range of 21 to 56 years.  Importantly, all patients in this National Institute of Health

("NIH") study who lived into their 50s developed ESRD.

106.    While no cure for Fabry Disease is yet available, one of the greatest breakthroughs in

scientific research on Fabry Disease has been the discovery that enzyme replacement

therapy with agalsidase beta (Fabrazyme®) can effectively treat Fabry patients.

107.  The scientific research on Fabry Disease leading to this breakthrough was a direct result of U.S. taxpayer funding.

108.  Specifically, the NIH awarded grant no. DK 34045 to Dr. Robert J. Desnick ("Desnick") at the Mount Sinai School of Medicine to develop Fabrazyme® as an enzyme replacement therapy to treat Fabry Disease and conduct clinical trials at the Mount Sinai School of Medicine.

109.  Mount Sinai was granted U.S. Patent No. 5,356,804 to a method of producing agalsidase beta subject to the requirements and obligations of 35 U.S.C. §§ 200-212, commonly known as the Bayh-Dole Act.

110.  Mount Sinai licensed U.S. Patent No. 5,356,804 for the manufacture of agalsidase beta (Fabrazyme®) to Genzyme Corporation, which is the sole supplier of the drug to the U.S. marketplace.

111.  In April 2003, the FDA granted approval for Genzyme to market Fabrazyme® for treatment of Fabry patients throughout the United States.

112.  The FDA approval of Fabrazyme® is based on a recommended prescribed dose of 1 mg/kg body weight infused every two weeks as an intravenous (IV) infusion.  *See* FDA-approved package insert, attached hereto and incorporated herein as Exhibit B.

113.  The pharmacological effectiveness of Fabrazyme® is diminished or negated by reducing the given dose below the FDA recommended 1mg/kg, reducing the dosage frequency by less that the FDA recommended every two weeks, or reducing both below FDA recommendations in combination.

114.  No other enzyme replacement therapy is approved in the U.S., although a slightly different molecule, designated agalsidase-alfa (Replagal®), is marketed overseas for

treatment of Fabry Disease.

115.    From the date of approval until approximately June 2009, Genzyme was able to manufacture enough Fabrazyme® to treat all currently diagnosed Fabry patients in the U.S.

116.    However, sometime before June 2009, Genzyme decreased production of Fabrazyme® as a result of a viral contamination in their Allston Landing, MA manufacturing plant.

117.    Genzyme caused the viral contamination of Fabrazyme®, by failing to clean and sterilize their bioreactors between production batches, and thus introduced the virus by cross-contamination.

118.    Specifically, Genzyme would use the same bioreactors to produce both Fabrazyme® and a different biological drug, Cerezyme®, which is used to treat another enzyme deficiency termed Gaucher disease.

119.    The Cerezyme® production batches were initially contaminated with the rodent virus, Vesivirus 2117, leading to a shortage of Cerezyme®.

120.    Genzyme then cross-contaminated Fabrazyme® cultures by failing to properly clean and sterilize the bioreactors before switching it for Fabrazyme® production leading to a shortage of Fabrazyme®.

121.    The Allston Landing facility was already the subject of a FDA warning letter that followed an inspection in September and October of 2008.  One of the FDA's concerns was the facility's lack of controls to protect against microbial contamination.

122.    Genzyme additionally shifted capital away from production and maintenance of Fabrazyme® stocks, leading to foreseeable insufficient capacity and inventory to mitigate any shortages it would encounter, despite the FDA warning.

123. Genzyme Chairman and Chief Executive Officer, Henri Termeer, admitted fault in a letter dated October 23, 2009 (four months after the shortage began) stating, "In retrospect we now understand that in an attempt to meet the needs of Gaucher, Fabry and Pompe patient communities, we strained our existing capacity.  The consequence was that our inventory of enzyme fell to suboptimal levels, leaving us unable to meet the full demand during this period of manufacturing interruptions."

124. Further, in November 2009, Genzyme produced Fabrazyme® vials that contained contaminants of particulate steel, glass and rubber.

125. The FDA and Department of Justice initiated action against Genzyme that resulted in a consent decree in May 2010, which included a $175 million dollar fine and oversight of the manufacture of Fabrazyme® for at least seven years.

126. In June 2009, as a direct result of its reduced production of Fabrazyme®, Genzyme unilaterally implemented a rationing plan for its reduced supply of Fabrazyme® for the then- known Fabry patients, wherein Genzyme unilaterally diluted the effective dose for known Fabry patients to only less than one-third (1/3) of the recommended prescribed dose ("Genzyme Rationing Plan").

127. By and through the Genzyme Rationing Plan, Genzyme also barred any newly diagnosed patients from receiving Fabrazyme®.

128. Such newly diagnosed patients were placed on a secret waiting list that ranked American Fabry patients by name for access to future supplies of Fabrazyme.

129. By and through the Genzyme Rationing Plan, Genzyme informed patients and their doctors that to remain at the front of the line on Genzyme's secret waiting list, the patient must take the diluted dose or be moved to the end of the secret waiting list.

130. Physicians only recommend the FDA-approved dose of 1mg/kg of Fabrazyme® infused every two weeks for their patients, in accordance with FDA labeling and the sole approved use of Fabrazyme®.

131. Under the Genzyme Rationing Plan, Genzyme refused to honor U.S. doctors' prescriptions for full undiluted doses of Fabrazyme®, thereby forcing U.S. physicians to administer a dangerously lowered dose contrary to their best medical judgment, including physicians employed by Defendant Mount Sinai who were treating Fabry patients at Mount Sinai facilities.

132. The Genzyme Rationing Plan physically prevented U.S. physicians, including those physicians employed by Defendant Mount Sinai, from exercising independent judgment for treating Fabry patients.

133. The Genzyme Rationing Plan has never been FDA-approved, nor has Genzyme or Mount Sinai sought approval by the FDA of the Genzyme Rationing Plan.

134. Dilution of drug doses for treatment of Fabry has never been approved or recommended by any state or federal medical authority.

135. As part of and in furtherance of the Genzyme Rationing Plan, Genzyme and Mount Sinai School of Medicine promulgated ad hoc and untested treatment protocols in an attempt to supersede the previously FDA-approved recommendations present in the labeling insert for Fabrazyme®, including adopting the rationing plan for Mt. Sinai's own patients.

136. Specifically, on September 23, 2009, Genzyme organized and underwrote a meeting termed the U.S. Fabrazyme Stakeholder's Working Group ("FSWG").

137. The document produced from the meeting is titled: Revised Guidance to the U.S. Fabry Community: Management of Fabrazyme® (agalsidase beta for injection) Supply

("Revised Guidance Document"). *See* FSWG Revised Guidance Document, which is attached hereto and incorporated herein as Exhibit C.

138. The members of FSWG included Genzyme Employees and Institutional representatives from the University of Iowa Hospitals and Clinics, Columbia University Medical Center, Children's Memorial Hospital, Baylor College of Medicine, Cincinnati Children's Hospital Medical Center, University of Minnesota, Duke University Health Center, University of Washington, Massachusetts General Hospital, University of Alabama at Birmingham, Cedar's-Sinai Medical Center, the National Fabry Disease Foundation, and the Fabry Support and Information Group.

139. The FSWG members all have received compensation in some form by Genzyme. Specifically, the Revised Guidance Document states that "some individuals who participated in the FSWG are employees of Genzyme and other individuals or their institutions or organizations receive or have received funding from Genzyme for research, education activities, and other purposes." *Id.*

140. Genzyme excluded governmental stakeholders such as the FDA, the NIH, independent experts, legal counsel, as well as individual Fabry patients who would be affected by these decisions from participation, thus limiting the Fabry Stakeholders Working Group to only financial "stakeholders" with Genzyme instead of the intended beneficiaries of Fabrazyme treatment—the patients.

141. Genzyme regularly continued to reference the non-FDA-approved Revised Guidance Document to doctors and patients with its supply updates as for example in its January 21, 2011 supply update to patients, but intentionally excluded the document from the FDA product insert for Fabrazyme®.

142.    Genzyme intended to and succeed in inducing reliance on its treatment recommendations as acknowledged in Executive Summary – 2009 Business Plan presented by Genzyme employee Jeanne Penn's slide presentation on August 18, 2009, wherein Genzyme stated that "in consultation with key stakeholders, we [Genzyme] worked to develop Cerezyme and Fabrazyme dose conservation guidelines."

143.    In the presentation on August 18, 2009, Genzyme also reported that "[i]nitial adoption of the Fabrazyme Stakeholders Working Group (FSWG) guidelines appears to be strong" and that "those in the Fabry community that have adopted the FSWG guidelines should be encouraged to continue to do so."  Moreover, "[t]hose in the community that have not yet adopted the FSWG guidelines are encouraged to consider doing so."

144.    Mount Sinai adopted the FSWG guideline promulgated by its licensee, Genzyme.

145.    Genzyme and Mount Sinai, by organizing, deciding, promulgating, adopting, and inducing reliance on the FSWG treatment guidelines outside of FDA approval process, assumed an additional duty of care to Fabrazyme® patients, because patients in the U.S. were no longer protected by FDA oversight under the Genzyme Rationing Plan. As such, Genzyme's development of guidelines for "dose conservation" (i.e., dose dilution) and Mt. Sinai's adoption and use of diluted Fabrazyme on its patients provided the only information to doctors and patients regarding the health effects of diluted doses of Fabrazyme®.

146.    As the licensor of Fabrazyme, Mt. Sinai collected medical information from its own patients from the diluted dose of Fabrazyme, but did not submit this information for review by any regulatory authorities or provide the data it collected to other patients, doctors, or the state and federal governments.

147.   On or about January 2010, pursuant to the Genzyme Rationing Plan, Genzyme slightly increased doses to only 50% of the FDA recommended prescribed doses.

148.   On February 17, 2010, Genzyme reported to European Physicians, but not U.S. physicians that "[a]ll patients, especially those with adjusted dose regimes should be under close clinical surveillance.  A medical examination, including all relevant clinical parameters, should be performed every two months.  It is of the utmost importance to monitor plasma [globotriaosylceramide] GL-3 or urinary GL-3 levels, as for the moment the GL-3 level is the most sensitive parameter.  Patients who demonstrate a deterioration of disease should reinitiate the original treatment with Fabrazyme."  (Emphasis added). (*See* [European] Healthcare Professional Communication (February 17, 2010), attached hereto and incorporated herein as Exhibit D.)

149.   On April 22, 2010, Genzyme stated that European, but not U.S. "physicians are advised to reinitiate the treatment with the original dosing regime or initiate a treatment with alternative approved medicinal product" for those experiencing "aggravation of disease symptoms and/or adverse events ascribed to the lowered dose of Fabrazyme."  (Emphasis added)  (*See* [European] Direct Healthcare Professional Communication (April 22, 2010), attached hereto and incorporated herein as Exhibit E.)

150.   On July 5, 2010, Genzyme reported to European Physicians, but not U.S. physicians, that "in situations where alternative treatment is not available or where (continuation of) medical treatment with Fabrazyme is deemed medically necessary it is important to note that an increase in clinical manifestations indicative of Fabry disease progression has been observed on lowered dose."  (*See* [European] Direct Healthcare Professional Communication (July 5, 2010), attached hereto and incorporated herein as Exhibit F.)

151.    Indeed, as early as October 22, 2010, the European Medicines Agency ("EMA") issued a press release stating that "[t]he [European Medicines Agency's Committee for Medicinal Products for Human Use] CHMP is now recommending that physicians switch back to prescribing the full dose of Fabrazyme® according to the authorised product information, depending on the availability of enzyme replacement therapy and the severity of the disease." *See* EMA recommendation for full dosage of Fabrazyme® for Fabry Patients attached hereto and incorporated herein as Exhibit G.

152.    The EMA's recommendation was based on the observation "that since the introduction of a lower dose of Fabrazyme® in June 2009, there has been a steady increase in the number of reported adverse events, matching the increase in the number of patients on the lower dose. At first, most of the events were pain-related, soon followed by reports of events affecting the heart, the central nervous system and the kidneys." *Id*.

153.    On November 16, 2010, the EMA publicly published a statistical study on the Fabrazyme® supply shortage in Europe, which showed that patients not only had a return of life threatening symptoms, but also an accelerated course of deterioration on the lowered dose. *See* EMA study attached hereto and incorporated herein as Exhibit H.

154.    The EMA found that "[i]n the early stages of the shortage the main increases in AEs [adverse events] were related to pain/paresthesia events, while later on in the shortage period, the main increases were in serious cardiac events such as myocardial infarction, in serious nervous disorders such as stroke, and – possibly to a lesser extent – in renal disorders. There have been consistent reports of a higher percentage of patients reporting peripheral pain, abdominal pain and diarrhea on a daily basis after 25 June 2009 (start of the shortage)." *Id*.

155. Genzyme participated in the EMA study as part of its administration of the "Fabry Registry," a database collecting information on all Fabry patients; Mount Sinai was also aware of the EMA's results.

156. On January 21, 2011, Genzyme reported to U.S. physicians that "[b]ecause Fabry disease is a complex condition, there is no clear way to decide which patients are in greatest need of treatment." *See* RE: U.S. Supply of Fabrazyme® (agalsidase beta) for February – April 2011 (January 21, 2011), attached hereto and incorporated herein as Exhibit I.

157. Notably, Genzyme later contradicted its position regarding the ostensible intractability of rating "need" for access to Fabrazyme by stating that Genzyme would restore "the most <u>severely</u> affected patients in Europe [i.e., those in greatest need] to full dose of Fabrazyme in Q1 2012." Emphasis added. *See* Genzyme Press Release "Genzyme Announces FDA Approval of Framingham Manufacturing Plant," (January 24, 2011), attached hereto and incorporated herein as Exhibit J.

158. Indeed, Genzyme reported three months prior in Europe that "only a handful of [consenting] patients" remained treated with low-dose Fabrazyme. *See* [European] Genzyme Fabrazyme® (agalsidase beta) Supply Update, Frequently Asked Questions, (October 3, 2011), attached hereto and incorporated herein as Exhibit K.

159. On March 25, 2011, Genzyme announced that it had destroyed yet another lot of defective Fabrazyme®, exacerbating the shortage for U.S. patients but not Europeans.

160. Genzyme informed U.S. patients being forced to miss infusions for the months of May and June of 2011 that "in order to share the impact of this loss [destruction of defective Fabrazyme], some Fabrazyme that was originally destined for patients treated in the U.S. will be diverted to patients elsewhere." *See* March 25, 2011 Genzyme letter, which is

attached hereto and incorporated herein as Exhibit L.

161.  In May and June of 2011, the "shared" impact of Genzyme's manufacturing error was discriminating against U.S. patients for access so as to preferentially allocate drug to Europeans so that those "patients elsewhere" could remain on full doses, despite such patients having access to alternative treatment not available in the U.S.

162.  During the shortage in August of 2010, U.S. Fabry patients had requested that the NIH exercise its march-in rights under the Bayh-Dole Act to allow other manufacturers to enter the market to make Fabrazyme® under U.S. Patent No. 5,356,804.

163.  On December 1, 2010, the NIH temporarily denied the petitioners' request for open licensing of Fabrazyme® in the U.S. but would review the case if Genzyme did not meet its promised date to end the shortage in the first half of 2011.[1]

164.  As such, due to Genzyme's manufacturing failure announced on March 25, 2011, *supra*, and its failure to meet its promise to end the shortage by the first half of 2011, the NIH re-opened the Fabrazyme® march-in case based on the new information regarding further manufacturing disruptions and shortages, as well as Genzyme's decision to allocate full doses to Europeans, who have an alternative available, thereby, causing preferential injury to American Fabry patients.

165.  As of April 8, 2011, Sanofi, the largest French drug manufacturer completed its acquisition of Genzyme Corporation, which is now a wholly-owned subsidiary of Sanofi.

166.  Sanofi-Aventis was aware of the liability created by the Genzyme Rationing Plan when it purchased Genzyme.

---

[1] December 1, 2010, NIH March-in Determination in The Case of Fabrazyme available at http://www.ott.nih.gov/policy/March-in-Fabrazyme.pdf.

167. Indeed, Christopher A. Viehbacher, CEO of Sanofi, assumed the position CEO of Genzyme Corporation and continued the Genzyme Rationing Plan promulgated by prior CEO, Henri Termeer.

168. Christopher A. Viehbacher later appointed David Meeker as CEO of Genzyme, who continued to allocate drug according to the Genzyme rationing plan, despite being a physician and being aware of the medical effects of diluting dosing of Fabrazyme for U.S. patients.

169. Beginning in August of 2011, Genzyme ceased all shipping of Fabrazyme in the United States but not overseas.  No U.S. patient received any medication from Genzyme during the month of August 2011.

170. Genzyme did not offer an explanation as to why shipping ceased for six weeks in the U.S. but not overseas.

171. Sporadic shipping to some U.S. individuals resumed in mid-September of 2011. However, Genzyme employee Erin Small stated to Plaintiff Lisa Killups on September 19th that September medication was being given out on a first come, first serve basis (not medical need or according to the secret waiting list), and that as orders come into the manufacturer, it would be shipped out to the pharmacies when drug becomes available. *cf.* "the most severely affected patients in Europe [were given] full dose[s] of Fabrazyme in Q1 2012".  *See*, Exhibit J, *supra*.

172. For November and December of 2011, Genzyme allowed some patients in the U.S. to receive full FDA doses, but subsequently, Genzyme returned U.S. patients (but not Europeans) to 50% doses.

173. In January 2012, Genzyme promised to restore the global Fabrazyme® supply during the

year.

174.    The Genzyme Rationing Plan was not based on any medical rationale or study of its effects on patients.  Allocation of the drug to U.S. patients has occurred randomly and ad hoc, despite the clear lack of proper labeling and dosing requirements, as well as clear medical danger as observed in Europe and reported by  U.S. patients and physicians.

175.    U.S. children with Fabry Disease also received only diluted doses of Fabrazyme® under the Genzyme Rationing Plan.

176.    Genzyme reported in its supply update of May 31, 2011, "[M]any children have grown significantly since the start of the supply shortage and are now receiving less than 1 mg per kilogram of Fabrazyme per shipment. In order to correct for this, beginning June 1, 2011 we are able to accommodate increases in total Fabrazyme dose due to weight gain for children and adolescents currently age 21 years and under."  *See,* Genzyme May 31, 2011 supply update attached hereto and incorporated herein as Exhibit M.

177.    The Genzyme Rationing Plan thus effectively under-dosed U.S. children even more than adult U.S. Fabry patients.

178.    Genzyme never informed U.S. doctors or patients of the results of the EMA study.

179.    Genzyme never disclosed to U.S. doctors or patients the need for medical examinations every two months for U.S. patients, despite recommending such a standard of care for European patients.

180.    Genzyme never convened another working group to address the additional information it had discovered regarding the dangers of diluting doses or promulgated any treatment guidelines or requested FDA approval to modify the labeling for Fabrazyme®, despite an ongoing duty to update and its treatment guidelines while the drug is given at diluted

doses.

181.   Genzyme never disclosed to U.S. doctors or patients the need to monitor plasma or urinary GL-3 levels every two months for U.S. patients, despite such monitoring being of "utmost importance" for the standard of care for European patients.

182.   Genzyme never disclosed to U.S. doctors or patients that "clinical manifestations indicative of Fabry disease progression has been observed on lowered dose," despite admitting to European physicians the importance of such observations especially "in situations where alternative treatment is not available" such as the U.S. *See*, Exhibit F, July 5, 2010 Healthcare Professional Communication, *supra*.

183.   Genzyme never advised U.S. physicians to reinitiate the original full dose treatment for U.S. patients that have disease progression, despite advising European physicians to take such action to protect the health and safety of European Fabry patients.

184.   Genzyme never provided drug to U.S. patients to reinitiate treatment with a full dose if they experienced disease progression on the diluted dose, despite advising and accordingly providing full drug access for European patients experiencing disease progression.

185.   When European Fabry patients asked Genzyme, "Why are patients treated differently in different regions globally? Why are patients in Europe treated on full dose and not in the USA?" Genzyme responded, "[T]he FSWG (Fabry Stakeholders Working Group) recommended that no group of [U.S.] Fabry patients should be designated to receive full dose." *See* FSWG Revised Guidance Document, Exhibit C, *supra*.

186.   Genzyme failed to disclose to Europeans that the FSWG guidelines were predicated on the assertion that "[a]ll countries and regions should participate in an equitable manner

proportional to demand." September 23, 2009 Genzyme FSWG revised Guidance Document Exhibit C, *supra*.

187. Similarly, Genzyme did not disclose that it was the sole authority organizing and promulgating the FSWG guidelines in the first place, none of which have been adopted, authorized, or reviewed by any governmental authority, except the European Medicines Agencies which expressly rejected such "guidelines."

188. The conduct of Genzyme extorting U.S. citizens to be administered a non-approved and dangerous drug dosage under threat of denial of access entirely and further gerrymandering the global supply of Fabrazyme® in order to discriminate among various regions for access was medically, legally, and ethically outrageous.

189. To limit loss of the European market share, Genzyme created a "general pool" of Fabrazyme® to maintain U.S. patients on diluted doses, while creating a reserve inventory for overseas patients to remain on full doses, so that Europeans would not switch to the competing product, Replagal®.

190. Indeed, Defendants sued Shire Corporation for patent infringement during the shortage for its manufacture and sale of Replagal® in Europe. The patent infringement cases were filed in the courts of Sweden, Germany, and the United Kingdom.

191. Defendant Mount Sinai sought an injunction against Shire but "promised" not to enforce it as long as Genzyme cannot make enough Fabrazyme to treat European patients (but not necessarily U.S. patients). Indeed once Genzyme was back to full capacity, Mount Sinai intended to assert the injunction to ban Replagal® from the European market if Shire did

not capitulate.[2]

192.   The case between Mount Sinai and Shire has since settled, but the terms are undisclosed.

193.   As a result, Mount Sinai has asserting the Fabrazyme® patent, which was funded by U.S. taxpayers under the Bayh-Dole Act, to further limit global Fabry treatment options as had already occurred in the U.S.    It is unknown to what extent the settlement agreement further limits supply or marketing of Fabrazyme® and Replagal® with regard to any specific geographical jurisdiction.

194.   Mount Sinai lost significant revenues when Genzyme's overseas customers switched from Fabrazyme® to Replagal® during the shortage, but it has had the ability to make up for these lost revenues in its settlement.   Genzyme itself stated on October 3, 2011, "Approximately 70% of European patients treated with Fabrazyme as of mid  2009 have by now been switched to an alternative treatment" [Shire's Replagal].   *See* [European] Genzyme Fabrazyme® (agalsidase beta) Supply Update, Frequently Asked Questions, (October 3, 2011), *supra*, Exhibit K.

195.   Genzyme preferentially discriminated against U.S. patients  (including those under the direct care of Defendant Mount Sinai's physicians) because Genzyme and Mount Sinai held and continue to hold complete market control over treatment options for Americans and Europeans.  Shire's Replagal® is not approved for use in the United States and, thus, American Fabry patients have no choice but to buy Genzyme's product if they are to be treated for their Fabry disease.

196.   American patients who have been injured by Genzyme's actions are still forced to

_____

2 Available at: www.governmentattic.org/5docs/Fabrazyme-NIH-Sinai_2011u.pdf. Last checked February 22, 2013.

purchase the product from Genzyme in order to remain alive and no second source is available.

197. Thus, as a direct result of manufacturing disruptions, Genzyme forced U.S patients (but not Europeans) to miss doses, which resulted in an increased risk and severity of acute adverse reactions due to inconsistent infusion schedules.

198. As a direct result of the Genzyme Rationing Plan and Genzyme's denial of access to drug in the U.S., dilution of the dose of drug in the U.S., change in dosing schedules in the U.S., and sale of adulterated drug in the U.S., American Fabry patients have had a return of symptoms, accelerated disease development, injury, and otherwise preventable disease progression of disease; or Fabry patients have died from these injuries.[3]

199. Observed injuries to U.S. patients from the diluted dosage were reported as recently as February 13th, 2013 at a Genzyme-sponsored meeting where Dr. Shagun Chopra, MD an assistant clinical professor of medicine at the University of California – San Diego and is the Director of Hemodialysis and Transplantation at the Navy Medical Center, San Diego, CA., discussed the injuries he personally observed in his patients.

200. Mount Sinai licenses U.S. Patent No. 5,356,804 to Genzyme under the contract law of New York and the Bayh-Dole act to specifically to benefit third parties having Fabry disease, specifically "to have recombinant x-galactosidase A developed and made available for general use to patients for the treatment of Fabry Disease and for these purposes is willing to grant an exclusive license to GENZYME upon the terms and conditions set forth below." *See*, Exhibit A, *supra*.

201. Mount Sinai has been involved in the testing, medical records collection and use of

---

[3] Schubert v. Genzyme et al., District Court of Utah, case 2:2012cv00587 (June 21, 2012).

diluted Fabrazyme® for on its own patients while under a license agreement with Genzyme.  Specifically, Mount Sinai provides "Technical information" to Genzyme, which is defined as "any and all proprietary technical data, know-how, information and material relating to the Product, its manufacture or use [including use of diluted doses]." *Id.* at 3.

202.  Mount Sinai solicits and provides ostensibly free testing for Fabry disease to all U.S. residents, hereinafter referred to as the "Mount Sinai Fabry Testing Program."

203.  Desnick, an inventor of Fabrazyme®, an employee of Mount Sinai and concurrent consulting agent for Genzyme, diagnoses Fabry patients under the Mount Sinai Testing Program and shares in the sales revenues of Fabrazyme® with Mt. Sinai and Genzyme, although his relationship was not disclosed to such patients.

204.  Mount Sinai holds medical records for Fabry patients placed on Fabrazyme® after being diagnosed under the Mount Sinai Fabry Testing Program, including records for named Plaintiffs as well as medical records for patients being administered diluted Fabrazyme®.

205.  Mount Sinai's patients were named and ranked for access on Genzyme's secret waiting list for Fabrazyme with the apparent knowledge and consent of Mount Sinai as the licensor.

206.  At all times relevant hereto, Desnick was and is a paid consulting agent for Genzyme as well as being an employee of Mount Sinai.  Desnick did not disclose his or Mount Sinai's financial interests in his communications with Fabry patients.

207.  Mount Sinai knows of and consents to Desnick's consultations with Genzyme.

208.  Mount Sinai, Genzyme, and Desnick are co-signatories to the contract licensing of Fabrazyme® to be generally developed and used to treat Fabry patients as third party

beneficiaries under contract law and the Bayh-Dole act.

209.   Desnick has consulted and continues to consult for Genzyme. His actions and inclusion as a signatory on the contract executed for the purpose of providing treatment with Fabrazyme® including diluted doses of the same, provide a nexus between Mount Sinai, Genzyme, and patients solicited and diagnosed under the Mount Sinai Testing Program and subsequently treated with Fabrazyme®.

210.   Defendant Mount Sinai knew of and adopted the Genzyme Rationing Plan, and despite having statutory and contractual duties to the contrary, described hereinafter, and with full knowledge that Genzyme had breached its agreement to provide Fabrazyme® to all Fabry patients, approved of and consented to the Genzyme Rationing Plan under its exclusive license agreement with Genzyme, and through Desnick's consultations with Genzyme and administration of diluted doses to its own patients.

211.   Genzyme and Mt. Sinai were aware of adverse events and the potential for such adverse events by diluting the dose of Fabrazyme® below FDA-approved levels.

212.   Mount Sinai treats Fabry patients, and has treated one or more of the Plaintiffs, as well as holding medical treatment and diagnosis records for one or more Plaintiffs.

213.   Mount Sinai was aware that its licensee Genzyme injured Mount Sinai's own patients and others who receive diluted dosing of Fabrazyme®, even while Genzyme shipped full doses to Fabry patients overseas.

214.   Indeed during the shortage, Mount Sinai and Desnick collected total higher revenues from European Fabrazyme sales per capita (at least two-fold) compared to U.S. patients during the shortagte, even while their own patients were forced to take only the dangerous and untested diluted doses under threat of withdrawal entirely.

215. Similarly Mount Sinai, as well as its employee and concurrent Genzyme agent Desnick, was aware of adverse events and the potential for such adverse events associated with Genzyme's Rationing Plan, but consented and maintained consent for licensing the patent for Fabrazyme®, despite having a duty to protect against the invention's unreasonable use and non-use under the Bayh-Dole Act and a duty of care to ensure the safety of Fabry patients consistent with its contractual obligations to such third party beneficiaries in the event of breach.

216. Mount Sinai never informed the NIH of the Genzyme Rationing Plan and the resultant unreasonable use and non-use of the invention under the Bayh-Dole act, thereby concealing the violations of the Bayh-Dole act from the NIH.

217. Neither Mount Sinai nor Genzyme has ever applied for, much less obtained, regulatory approval of the Genzyme Rationing Plan and administration of a diluted Fabrazyme® doses to treat Fabry disease at any hospital in any jurisdiction, but instead promulgated and adopted its own treatment guidelines superseding the FDA approval process.

218. Genzyme enforced the rationing plan outside of the government regulatory authorities and outside the jurisdiction of the courts by forcing patients to take the unapproved and diluted dose if they wished to remain at the "front of the line" during the shortage.

219. European patients were never placed in the U.S. line and thus the discrimination for access was based entirely on a Fabry patient's national origin, not medical need.

220. The Genzyme Rationing Plan and the product inserts provided with diluted drug doses violated federal or state laws regarding sale of prescription drugs in the U.S.  and were never approved by any regulatory authority.

221. The additional treatment guidelines provided for administration of Fabrazyme®, which

were promulgated by Genzyme in consultation with the FSWG, are not in compliance with federal laws regarding labeling of prescription drugs in the U.S.  Indeed, the FSWG has no medical or statutory authority recognized by the Department of Health and Human Services or any state public health authorities.

222.   The Genzyme Rationing Plan and the product inserts provided with the diluted drug doses were not in compliance with Federal laws regarding licensing of drugs or of the use of publicly funded inventions under the Bayh-Dole act.

223.   The Genzyme Rationing Plan breached the N.Y. license contract with Mount Sinai and the contractor license with the Department of Health and Human Services, which expressly provides for treatment of Fabry patients as intended third party beneficiaries in accordance with the Bayh-Dole mandate against non-use and unreasonable use of the invention.

224.   Neither Mount Sinai nor Genzyme warned doctors or doctor's patients as to what adverse events had been observed or could result from the Genzyme Rationing Plan despite being aware of such dangers from its own physicians and consults and, further, despite having a common law duty to warn both patients and doctors as the drug was given at diluted, noncompliant, unapproved doses that does not qualify for statutory federal or state safe harbor.

225.   Neither Mount Sinai nor Genzyme has ever shown that a diluted dose of Fabrazyme® is either safe or efficacious for treating Fabry disease for its own patients or others and, in fact, had obtained overwhelming medical evidence to the contrary of the grave dangers of diluting the dose below FDA-approved levels.

226.   The negative medical information collected by Genzyme and Mount Sinai on the effects

of the diluted dosage was not disclosed or reported to regulatory authorities.

227.    Fabry patients who are administered Fabrazyme® never receive title to the drug, the patent, or obtain any other property right in Fabrazyme®, which all remain with Mt. Sinai and its licensees.

228.    For over two years, Genzyme made numerous illusory promises to patients and the Government as to the end date of the shortage. [4]

---

[4] June 24, 2009:  "The company [Genzyme] currently expects the period of shortage for Cerezyme and Fabrazyme to last approximately 6-8 weeks. This period is expected to begin in August for Cerezyme and in October for Fabrazyme."

July 22, 2009:  "Genzyme has now completed the sanitization of the Allston facility and is on-track to resume production of both drugs there this month.  Genzyme expects new Cerezyme and Fabrazyme supply from Allston by the end of the year [2009]."

October 21, 2009:  "Genzyme has completed the first production cycles for Fabrazyme, is preparing to begin the next, and anticipates that the first shipments of new Fabrazyme will take place in late-December. The company expects that it will be able to fully meet anticipated demand for these therapies in the first quarter of 2010."

February 22, 2010: "[W]e have not achieved the expected Fabrazyme inventory level needed to support our goal of meeting 70% of global demand in April. We have taken steps to increase and stabilize the production of Fabrazyme and if these efforts are successful, we anticipate that we will be able to increase Fabrazyme availability to patients for the second half of 2010."

April 21, 2010:   "Genzyme has made progress in increasing the productivity of the Fabrazyme manufacturing process. The first run of a new working cell bank (WCB) resulted in a 30 percent increase in productivity, and a second run is underway. Genzyme's goal is to increase productivity an additional 30 percent. Genzyme estimates that it will need to continue the 30 percent shipping allocation through the third quarter."

July 21, 2010:  "We do expect that supply will change in a meaningful way by the end of September, and in the October through December 2010 time period additional supply will be available to support increases in

229.    In direct contravention to the conduct detailed above, Genzyme admits a responsibility and duty to provide equal access to treatment "regardless of their location, financial situation, or other circumstance" and that "in periods of shortage treatment should be prioritized to the most vulnerable patients, regardless of their pay status or geographical location and getting individual patients and physicians involved in decision making for treatment allocations." *See*, Corporate Responsibility Statement available at www.genzyme.com/Responsibility/Patient-Access-to-Treatment.aspx , attached hereto and incorporated herein as Exhibit N.

230.    While no information is available as to the exact end date of the shortage, the NIH closed the March-in petition on February 13, 2013, stating that "[b]ased on Mount Sinai's and the Genzyme's representations in their respective December 2012 reports and the ability of U.S. Fabry patients to obtain full doses of Fabrazyme®, NIH has closed the…march-in case." *See*, NIH letter, attached hereto and incorporated herein as Exhibit M.

---

Fabrazyme dose or infusion frequency."

        December 1, 2010:  "Genzyme has expressed its commitment to provide a full supply of Fabrazyme® in the first half of 2011."

        March 25, 2011: "[w]e want to assure you that we are still on track to return to normal supply of Fabrazyme in the second half of 2011 with the expected approval of our new manufacturing facility in Framingham, Massachusetts"

        July 28, 2011:  "The Framingham plant is undergoing validation and our current expectation is that we will begin to be able to supply Fabrazyme produced at the plant to patients in the first quarter of 2012."

        January 24, 2012:  "Genzyme will begin the process of moving the most severely affected patients in Europe to full dose of Fabrazyme in Q1 2012. Beginning in March [2012], all patients in the U.S. currently on therapy will be returned to full dosing."  *Emphasis added.*

231.    All Plaintiffs are now currently receiving full doses of Fabrazyme® although the effects

of the long-term dilution of the medication continue to manifest.

## COUNTS

### COUNT I: NEGLIGENCE

**PHILIP ADAMO; JAMES BEADNELL; JOY BEADNELL; PATRICIA BEEN; MERCEDES BEEN; JAMES BISHOP; KRISTINA BOHANNON; STEPHANIE BRIONES; PLAINTIFF J.B.; PLAINTIFF I.B.F.; PLAINTIFF I.B.M.; LYNSEY CALLAHAN; TONI CORDOVA; JOHN CORTINA; SIRO CORTINA; GINA DECOTIIS; ADAM DIBLE; LINDA DURKIN; CAROL E. EMERSON; ROSS FREDERICKSON; EUGENE GNIDOVEC; MICHAEL GNIDOVEC; PHIL HEIDRICK; MARY HELTON; PLAINTIFF D.H.; PLAINTIFF B.H.; SHERYL HUGHES; JEANNETTE HYATT; KEVIN HYATT; MARGARET HYATT; CHASTITY JOHNSON;  PLAINTIFF D.J.;  PLAINTIFF S.J.; MICHAEL KILLUPS; ANGELA KING; DAMON LAFORCE; RONALD LECOMTE; MICHAEL LEZON; CHRIS LONG; CAROLYN LUBKER; JAMES MATTHEWS; SCOTT PATRICK;  GARRETT RAWINSKY; JON RAWINSKY; COURTNEY REDDICK; MEGAN SHEFKE; BRADFORD STEVENS; LINDA STRANGE; MICHAEL SICO; TERESA VIERS; JOSEPH WALLACE;  WILLETE TOBY WEHUNT; SHASHONE WEISE; PLAINTIFF B.W.; LAURA WINCHESTER; TRINA WILKINS;  PLAINTIFF N.L., SANDRA WILKINS; JASON WROBLESKI; AND MARC WROBLESKI, v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE**

232.    Paragraphs 1 through 231 are incorporated hereunder as though fully set forth at length.

233.    The injuries sustained by Plaintiffs were due to and were the direct and proximate result

of the negligence, carelessness, and recklessness of Defendants Genzyme and Mount

Sinai generally, and under the following particulars:

   a.  in that Defendants failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;
   b.  in that Defendants failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;
   c.  in that Defendants failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass, and rubber;
   d.  in that the Defendants unilaterally devised, implemented, and approved with knowledge and consent the Genzyme Rationing Plan, and otherwise reduced or consented to reducing the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients;
   e.  in that Defendants sold Fabrazyme® vials contaminated with virus, glass, rubber and steel particles;

- 44 -

f.  in that the Defendants designed, implemented and consented to the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens without discrimination and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

g.  in that the Defendants instructed and through knowledge and consent reduced the dose of Fabrazyme® to dangerous, sub-efficacious and unapproved levels to Americans based solely on national origin;

h.  in that the Defendants barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i.  in affirmatively representing that the drug given at full dosage would be sold to citizens at various dates, but breached such promises repeatedly since June 2009;

j.  in that the Defendants failed to test or require the testing of the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease or report such effects;

k.  in that the Defendants failed to provide adequate warnings, cautions, and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme® that they observed or foresaw;

l.  in that the Defendants failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

m.  in that the Defendants failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

n.  in otherwise failing to exercise the care and caution that a reasonable, careful, and prudent entity would have or should have exercised under the circumstances; and

o.  In that Defendants violated the following statutes, giving rise to negligence per se:

    i.  The Food, Drug, and Cosmetics Act 21 U.S.C. §351(a-d) regarding adulterated products;

    ii.  21 USC §352(f) regarding adequate warning and labeling;

    iii.  21 U.S.C. §355(j) regarding the statutory approval process for testing of previously unapproved doses;

    iv.  21 U.S.C. §356a(a) regarding testing required for substantial manufacturing changes;

    v.  The Bayh-Dole Act 35 U.S.C. §200 regarding the prohibition of unreasonable use or non-use of Bayh-Dole regulated inventions which are necessary for human health and in requiring patients (including patients treated at Mt. Sinai) to take the unapproved dosage in order to remain at the front of a secret waiting list for access to the federally funded invention or be denied access entirely if the patient protested.

    vi.  The individual state statutes protecting Plaintiffs from adulterated or misbranded drugs in that the dosages being shipped were not in compliance (or even intended to be in compliance) with FDA approval or

labeling at the time the drug left the control of the manufacturer or seller[5];

   vii.  The equal protections clause of the Constitution as applied to government contractors via the Bayh-Dole act.

234.   As a direct and proximate result of Defendants' willful and wanton conduct, as set forth above, and reckless indifference to Plaintiffs' health and interests, Plaintiffs have sustained, or are at imminent risk of sustaining, the following serious injuries consistent with deterioration of disease, some or all which may be of a permanent nature:

   a.  renal injury;
   b.  cardiac injury;
   c.  neurological injury;
   d.  peripheral pain;
   e.  chronic abdominal pain and diarrhea;
   f.  impairment of vision;
   g.  impairment of hearing;
   h.  increased severity and likelihood of infusion reactions, and
   i.  premature death and other serious and permanent injuries.

235.   As a direct and proximate result of the aforesaid injuries, Plaintiffs have been damaged as follows:

   a.  Plaintiffs have been and will be required to expend large sums of money for medical and surgical attention, medical and surgical supplies, medical and surgical appliances, and medicines;
   b.  Plaintiffs have suffered and will continue to suffer great pain, suffering, inconvenience, impairment of bodily function, and mental anguish;
   c.  Plaintiffs have been and will be deprived of earnings and earning capacity;
   d.  Plaintiffs have suffered loss of enjoyment of life;

[5] AZ (A.R.S. § 32-1966-68); CA (California Code § 1111250-111510); CT (C.G.S. 21a § Sec. 21a-105 et seq.); IL (ILCS 410 § 620 et seq.); IN (I.C. § 16-42-2-1 et seq.) ; KY (K.R.S. chapter 217 et seq.); MA (M.G.L. 94 § 186 et seq.); MI (MI Comp L § 289.2107 et seq.); NC (G.S. § 14-34.4 et seq.); NE (N.S. § 71-2404 et seq.); NM (N.M.S. § 26-1-10); NV (N.R.S. § 585.010 et seq.) ; NY (N.Y. EDN. Law § 6800 et seq. and § 6815 et seq.); PA (Pa.S. 35 § 780-113 et seq.); SC (S.C.C. § 39-23-10); VA (Va. Code § 54.1-3461 et seq.); WA (RCW § 69.04.410-440).

e.    Plaintiffs have died or suffered a reduced life expectancy; and

f.    Plaintiffs' general health, strength, and vitality have been impaired.


WHEREFORE, Plaintiffs James Beadnell, Joy Beadnell, Patricia Been, Mercedes Been, James Bishop, Stephanie Briones, Plaintiff J.B., Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Lynsey Callahan, Toni Cordova, John Cortina, Siro Cortina, Gina DeCotiis, Adam Dible, Linda Durkin, Carol E. Emerson, Ross Frederickson, Eugene Gnidovec, Michael Gnidovec, Phil Heidrick, Mary Helton, Plaintiff B.H., Sheryl Hughes, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, Chastity Johnson, Plaintiff D.J.,  Plaintiff S.J., Michael Killups, Angela King, Damon LaForce, Ronald Lecomte, Chris Long, Carolyn Lubker, James Matthews, Scott Patrick, Garrett Rawinsky, Jon Rawinsky, Courtney Reddick, Megan Shefke, Bradford Stevens, Linda Strange, Michael Sico, Teresa Viers, Joseph Wallace, Willete Toby Wehunt, Shashone Weise, Plaintiff B.W., Laura Winchester, Trina Wilkins, Plaintiff N.L., Sandra Wilkins, Jason Wrobleski, and Marc Wrobleski, demand judgment against Defendants, Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with costs of suit and punitive damages as applicable.  JURY TRIAL DEMANDED.


## COUNT II: STRICT LIABILITY

**PHILIP ADAMO; JAMES BEADNELL; JOY BEADNELL; PATRICIA BEEN; MERCEDES BEEN; JAMES BISHOP; KRISTINA BOHANNON; STEPHANIE BRIONES; PLAINTIFF J.B.; PLAINTIFF I.B.F.; PLAINTIFF I.B.M.; LYNSEY CALLAHAN; TONI CORDOVA; JOHN CORTINA; SIRO CORTINA; GINA DECOTIIS; ADAM DIBLE; LINDA DURKIN; CAROL E. EMERSON; ROSS FREDERICKSON; EUGENE GNIDOVEC; MICHAEL GNIDOVEC; PHIL HEIDRICK; MARY HELTON; PLAINTIFF D.H.; PLAINTIFF B.H.; SHERYL HUGHES; JEANNETTE HYATT; KEVIN HYATT; MARGARET HYATT; CHASTITY JOHNSON;  PLAINTIFF D.J.; PLAINTIFF S.J.; MICHAEL KILLUPS; ANGELA KING; DAMON LAFORCE; RONALD LECOMTE; MICHAEL LEZON; CHRIS LONG; CAROLYN LUBKER; JAMES MATTHEWS; SCOTT PATRICK;  GARRETT RAWINSKY;  JON  RAWINSKY;  COURTNEY  REDDICK;  MEGAN  SHEFKE;**

**BRADFORD STEVENS; LINDA STRANGE; MICHAEL SICO; TERESA VIERS; JOSEPH WALLACE; WILLETE TOBY WEHUNT; SHASHONE WEISE; PLAINTIFF B.W.; LAURA WINCHESTER; TRINA WILKINS; PLAINTIFF N.L., SANDRA WILKINS; JASON WROBLESKI; AND MARC WROBLESKI v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE**

236.    Paragraphs 1 through 235 are incorporated hereunder as though fully set forth at length.

237.    Defendants Genzyme and Mount Sinai are strictly liable to Plaintiffs as follows:

     a.  for failure to adequately and safely label the diluted dosage of Fabrazyme®;

     b.  for selling and licensing the use of Fabrazyme® at a defective dose;

     c.  for selling Fabrazyme® in a defective dosage and condition being adulterated with virus, glass, rubber, and steel particles;

     d.  for selling and licensing the use of Fabrazyme® at a diluted dose when the dose is untested and unreasonably dangerous for its intended use; and

     e.  for failure to give adequate and complete warnings of the known or knowable dangers involved in the use Fabrazyme® at a diluted dose.

By virtue of the strict liability of Defendants, Defendants are liable for the severe injuries and conditions, as set forth herein in Count I of Plaintiffs Philip Adamo, James Beadnell, Joy Beadnell, Patricia Been, Mercedes Been, James Bishop, Stephanie Briones, Plaintiff J.B., Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Lynsey Callahan, Toni Cordova, John Cortina, Siro Cortina, Gina DeCotiis, Adam Dible, Linda Durkin, Carol E. Emerson, Ross Frederickson, Eugene Gnidovec, Michael Gnidovec, Phil Heidrick, Mary Helton, Plaintiff B.H. , Sheryl Hughes, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, Chastity Johnson,   Plaintiff D.J., Plaintiff S.J., Michael Killups, Angela King, Damon LaForce, Ronald Lecomte, Michael Lezon, Chris Long, Carolyn Lubker, James Matthews, Scott Patrick, Garrett Rawinsky, Jon Rawinsky, Courtney Reddick, Megan Shefke, Bradford Stevens, Linda Strange, Michael Sico, Teresa Viers, Joseph Wallace, Willete Toby Wehunt, Shashone Weise, Plaintiff B.W., Laura Winchester, Trina Wilkins, Plaintiff N.L., Sandra Wilkins, Jason Wrobleski, and Marc Wrobleski have suffered damages, as set forth herein in Count II.

    238.    As a direct and proximate result of the aforesaid injuries, Plaintiffs Philip Adamo,

James Beadnell, Joy Beadnell, Patricia Been, Mercedes Been, James Bishop, Stephanie Briones, Plaintiff J.B., Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Lynsey Callahan, Toni Cordova, John Cortina, Siro Cortina, Gina DeCotiis, Adam Dible, Linda Durkin, Carol E. Emerson, Ross Frederickson, Eugene Gnidovec, Michael Gnidovec, Phil Heidrick, Mary Helton, Plaintiff B.H. , Sheryl Hughes, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, Chastity Johnson, Plaintiff D.J.,  Plaintiff S.J., Michael Killups, Angela King, Damon LaForce, Ronald Lecomte, Michael Lezon, Chris Long, Carolyn Lubker, James Matthews, Scott Patrick, Garrett Rawinsky, Jon Rawinsky, Courtney Reddick, Megan Shefke, Bradford Stevens, Linda Strange, Michael Sico, Teresa Viers, Joseph Wallace, Willete Toby Wehunt, Shashone Weise, Plaintiff B.W., Laura Winchester, Trina Wilkins, Plaintiff N.L., Sandra Wilkins, Jason Wrobleski, and Marc Wrobleski have suffered damages as set forth herein in Count II.

WHEREFORE, Plaintiffs Philip Adamo, James Beadnell, Joy Beadnell, Patricia Been, Mercedes Been, James Bishop, Stephanie Briones, Plaintiff J.B., Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Lynsey Callahan, Toni Cordova, John Cortina, Siro Cortina, Gina DeCotiis, Adam Dible, Linda Durkin, Carol E. Emerson, Ross Frederickson, Eugene Gnidovec, Michael Gnidovec, Phil Heidrick, Mary Helton, Plaintiff B.H. , Sheryl Hughes, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, Chastity Johnson,   Plaintiff D.J.,  Plaintiff S.J., Michael Killups, Angela King, Damon LaForce, Ronald Lecomte, Michael Lezon, Chris Long, Carolyn Lubker, James Matthews, Scott Patrick, Garrett Rawinsky, Jon Rawinsky, Courtney Reddick, Megan Shefke, Bradford Stevens, Linda Strange, Michael Sico, Teresa Viers, Joseph Wallace, Willete Toby Wehunt, Shashone Weise, Plaintiff B.W., Laura Winchester, Trina Wilkins, Plaintiff N.L., Sandra Wilkins, Jason Wrobleski, and Marc Wrobleski, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount

in excess of $75,000.00, together with costs of suit and punitive damages as applicable.  JURY

TRIAL DEMANDED.

## COUNT III: BREACH OF WARRANTY

**JAMES BEADNELL; JOY BEADNELL; PATRICIA BEEN; MERCEDES BEEN; JAMES BISHOP; KRISTINA BOHANNON; STEPHANIE BRIONES; PLAINTIFF J.B.; PLAINTIFF I.B.F.; PLAINTIFF I.B.M.; LYNSEY CALLAHAN; TONI CORDOVA; JOHN CORTINA; SIRO CORTINA; GINA DECOTIIS; ADAM DIBLE; LINDA DURKIN; CAROL E. EMERSON; ROSS FREDERICKSON; EUGENE GNIDOVEC; MICHAEL GNIDOVEC; PHIL HEIDRICK; MARY HELTON; PLAINTIFF D.H.; PLAINTIFF B.H.; SHERYL HUGHES; JEANNETTE HYATT; KEVIN HYATT; MARGARET HYATT; CHASTITY JOHNSON; PLAINTIFF D.J.;  PLAINTIFF S.J.; MICHAEL KILLUPS; ANGELA KING; DAMON LAFORCE; RONALD LECOMTE; CHRIS LONG; CAROLYN LUBKER; JAMES MATTHEWS; SCOTT PATRICK; GARRETT RAWINSKY; JON RAWINSKY; COURTNEY REDDICK; MEGAN SHEFKE; BRADFORD STEVENS; LINDA STRANGE; MICHAEL SICO; TERESA VIERS;  JOSEPH WALLACE;  WILLETE TOBY WEHUNT; SHASHONE WEISE; PLAINTIFF B.W.; LAURA WINCHESTER; TRINA WILKINS; PLAINTIFF N.L.; SANDRA WILKINS; JASON WROBLESKI; AND MARC WROBLESKI v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE**

239.    Paragraphs 1 through 238 are incorporated hereunder as though fully set forth at length.

240.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly

and proximately from Defendants Genzyme's and Mount Sinai's breach of express and

implied warranties of merchantability or fitness for the use of Fabrazyme®, in the

following particulars:

     a.  Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product and inconsistent dosing reduces such deposition and having observed the contrary for the diluted doses;

     b.  Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

     c.  the Defendants failed to adequately, properly, and timely test the diluted dose prior to use;

     d.  Fabrazyme®, given at diluted dosage and being adulterated with glass, steel, and rubber particles, is not fit for the ordinary purpose for which it is customarily or

foreseeably used;

e.  the Defendants knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

f.  Fabrazyme®, given at diluted dosage and being adulterated, was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

g.  the Defendants knew or should have known that in order to make Fabrazyme® effective for its intended use, they should have provided the drug at the recommended dose;

h.  the Defendants knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, they should have provided warnings on the product to protect users;

i.  the Defendants did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn users;

j.  the Defendants did not disclose to the users of the diluted dosage of Fabrazyme® that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

k.  the Defendants included an incorrect and unapproved product insert  because Defendants do not allow physicians to treat patients with the recommended dose for which the insert was intended;

l.  the Defendants knew or should have known that users were relying upon the expertise of the Defendants in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

m.  in affirmatively representing that the drug given at full dosage would be sold to citizens at various dates, but breached such promises repeatedly since June 2009;

n.  in expressly and impliedly warranting that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

o.  in expressly and impliedly misrepresenting that a lowered dose of Fabrazyme® was approved for by the FDA and efficacious for use in the treatment of Fabry disease.

p.  in expressly and impliedly misrepresenting that a lowered dose of Fabrazyme® was approved for by the FDA and efficacious for use in the treatment of Fabry disease.

As a direct and proximate cause of the breach of these expressed or implied warranties,

Plaintiffs James Beadnell, Joy Beadnell, Patricia Been, Mercedes Been, James Bishop, Stephanie

Briones, Plaintiff J.B., Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Lynsey Callahan,

Toni Cordova, John Cortina, Siro Cortina, Gina DeCotiis, Adam Dible, Linda Durkin, Carol E.

Emerson, Ross Frederickson, Eugene Gnidovec, Michael Gnidovec, Phil Heidrick, Mary Helton,

Plaintiff B.H., Sheryl Hughes, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, Chastity Johnson, Plaintiff D.J.,  Plaintiff S.J., Michael Killups, Angela King, Damon LaForce, Ronald Lecomte, Chris Long, Carolyn Lubker, James Matthews, Scott Patrick, Garrett Rawinsky, Jon Rawinsky, Courtney Reddick, Megan Shefke, Bradford Stevens, Linda Strange, Michael Sico, Teresa Viers, Joseph Wallace, Willete Toby Wehunt, Shashone Weise, Plaintiff B.W., Laura Winchester, Trina Wilkins, Plaintiff N.L., Sandra Wilkins, Jason Wrobleski, and Marc Wrobleski, suffered severe injuries and conditions as set forth herein in Count III.

241.     As a result of their injuries and conditions, Plaintiffs As a direct and proximate cause of the breach of these expressed or implied warranties, Plaintiffs James Beadnell, Joy Beadnell, Patricia Been, Mercedes Been, James Bishop, Stephanie Briones, Plaintiff J.B., Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Lynsey Callahan, Toni Cordova, John Cortina, Siro Cortina, Gina DeCotiis, Adam Dible, Linda Durkin, Carol E. Emerson, Ross Frederickson, Eugene Gnidovec, Michael Gnidovec, Phil Heidrick, Mary Helton, Plaintiff B.H. , Sheryl Hughes, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, Chastity Johnson,   Plaintiff D.J., Plaintiff S.J., Michael Killups, Angela King, Damon LaForce, Ronald Lecomte, Chris Long, Carolyn Lubker, James Matthews, Scott Patrick, Garrett Rawinsky, Jon Rawinsky, Courtney Reddick, Megan Shefke, Bradford Stevens, Linda Strange, Michael Sico, Teresa Viers, Joseph Wallace, Willete Toby Wehunt, Shashone Weise, Plaintiff B.W., Laura Winchester, Trina Wilkins, Plaintiff N.L., Sandra Wilkins, Jason Wrobleski, and Marc Wrobleski, suffered severe injuries and conditions as set forth herein in Count have suffered damages as set forth herein in Count III.

WHEREFORE, Plaintiffs As a direct and proximate cause of the breach of these expressed or implied warranties, Plaintiffs James Beadnell, Joy Beadnell, Patricia Been,

Mercedes Been, James Bishop, Stephanie Briones, Plaintiff J.B., Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Lynsey Callahan, Toni Cordova, John Cortina, Siro Cortina, Gina DeCotiis, Adam Dible, Linda Durkin, Carol E. Emerson, Ross Frederickson, Eugene Gnidovec, Michael Gnidovec, Phil Heidrick, Mary Helton, Plaintiff B.H., Sheryl Hughes, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, Chastity Johnson,   Plaintiff D.J.,   Plaintiff S.J., Michael Killups, Angela King, Damon LaForce, Ronald Lecomte, Chris Long, Carolyn Lubker, James Matthews, Scott Patrick, Garrett Rawinsky, Jon Rawinsky, Courtney Reddick, Megan Shefke, Bradford Stevens, Linda Strange, Michael Sico, Teresa Viers, Joseph Wallace, Willete Toby Wehunt, Shashone Weise, Plaintiff B.W., Laura Winchester, Trina Wilkins, Plaintiff N.L., Sandra Wilkins, Jason Wrobleski, and Marc Wrobleski, suffered severe injuries and conditions as set forth herein in Count, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with costs of suit.  JURY TRIAL DEMANDED.

### COUNT IV: VIOLATION OF BAYH-DOLE ACT PROSCRIPTION OF NON-USE OR UNREASONABLE USE OF PUBLICALLY FUNDED INVENTIONS (IMPLIED CAUSE OF ACTION)

**PHILIP ADAMO; JAMES BEADNELL; JOY BEADNELL; PATRICIA BEEN; MERCEDES BEEN; JAMES BISHOP; KRISTINA BOHANNON; STEPHANIE BRIONES; PLAINTIFF J.B.; PLAINTIFF I.B.F.; PLAINTIFF I.B.M.; LYNSEY CALLAHAN; TONI CORDOVA; JOHN CORTINA; SIRO CORTINA; GINA DECOTIIS; ADAM DIBLE; LINDA DURKIN; CAROL E. EMERSON; ROSS FREDERICKSON; EUGENE GNIDOVEC; MICHAEL GNIDOVEC; PHIL HEIDRICK; MARY HELTON; PLAINTIFF D.H.; PLAINTIFF B.H.; SHERYL HUGHES; JEANNETTE HYATT; KEVIN HYATT; MARGARET HYATT; CHASTITY JOHNSON;  PLAINTIFF D.J.; PLAINTIFF S.J.; MICHAEL KILLUPS; ANGELA KING; DAMON LAFORCE; RONALD LECOMTE; MICHAEL LEZON; CHRIS LONG; CAROLYN LUBKER; JAMES MATTHEWS; SCOTT PATRICK; GARRETT RAWINSKY; JON RAWINSKY; COURTNEY REDDICK; MEGAN SHEFKE; BRADFORD STEVENS; LINDA STRANGE; MICHAEL SICO; TERESA VIERS; JOSEPH WALLACE;  WILLETE TOBY WEHUNT; SHASHONE WEISE; PLAINTIFF B.W.; LAURA WINCHESTER; TRINA WILKINS; PLAINTIFF N.L., SANDRA WILKINS; JASON WROBLESKI; AND MARC WROBLESKI v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE**

242. Paragraphs 1 through 241 are incorporated hereunder as though fully set forth at length.

243. The injuries sustained by Plaintiffs were due to Defendants Genzyme and Mount Sinai violating the Bayh-Dole Act (35 U.S.C. §200), generally and under the following particulars:

    a. in that the Defendants reduced the dose of Fabrazyme® or denied it entirely for Plaintiffs' Fabry disease, thereby unreasonably using and engaging in non-use of the publicly-funded invention, U.S. Patent No. 5,356,804;

    b. in that the Defendants instituted the drug ban for some citizens and rationing to other citizens, despite a contractual duty, assumed duty, and statutory duty to ensure that Fabrazyme® was made available equally without discrimination to U.S. citizens and at the required dose pursuant to the Bayh-Dole Act's specific prohibition against a contractor's non-use and unreasonable use of publically funded invention under 35 U.S.C. §200;

    c. in that the Defendants failed to require or provide adequate safeguards to prevent or mitigate damages resulting from the unreasonable use and non-use of publicly-funded invention, U.S. Patent No. 5,356,804;

    d. in that the Defendants instituted the rationing and denial of access despite lacking title or other property right to any patent right of non-use or unreasonable use that otherwise may be allowed under 35 U.S.C. § 271(d)(4);

    e. in that the Defendants willfully barred physicians from administering the prescribed and lawful recommended dose of the invention Fabrazyme®;

    f. in that Defendants willfully mislead the NIH regarding ostensibly equitable distribution of Fabrazyme to U.S. citizens during the shortage, in an attempt to forestall governmental action; and

    g. in that the Defendants caused special injuries unique to the protected class created under the language of 35 U.S.C. §200 and the Equal Protections Clause of the Constitution, whereby such injuries directly arise out of the non-use and unreasonable use of the invention, because the Plaintiffs have Fabry disease and rely on access without discrimination to the publicly funded invention, Fabrazyme®, specifically to treat their disease, which is otherwise fatal.

244. By virtue of the violation of the Bayh-Dole Act, Defendants are liable for the severe injuries and conditions of Plaintiffs Philip Adamo, James Beadnell, Joy Beadnell, Patricia Been, Mercedes Been, James Bishop, Stephanie Briones, Plaintiff J.B., Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Lynsey Callahan, Toni Cordova, John Cortina, Siro Cortina, Gina DeCotiis, Adam Dible, Linda Durkin, Carol E. Emerson, Ross Frederickson, Eugene

Gnidovec, Michael Gnidovec, Phil Heidrick, Mary Helton, Plaintiff B.H. , Sheryl Hughes, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, Chastity Johnson, Plaintiff D.J.,  Plaintiff S.J., Michael Killups, Angela King, Damon LaForce, Ronald Lecomte, Michael Lezon, Chris Long, Carolyn Lubker, James Matthews, Scott Patrick, Garrett Rawinsky, Jon Rawinsky, Courtney Reddick, Megan Shefke, Bradford Stevens, Linda Strange, Michael Sico, Teresa Viers, Joseph Wallace, Willete Toby Wehunt, Shashone Weise, Plaintiff B.W., Laura Winchester, Trina Wilkins, Plaintiff N.L., Sandra Wilkins, Jason Wrobleski, and Marc Wrobleski, as set forth herein in Count IV.

245.  As a result of their injuries and conditions, Plaintiffs Philip Adamo, James Beadnell, Joy Beadnell, Patricia Been, Mercedes Been, James Bishop, Plaintiff J.B., Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Lynsey Callahan, Toni Cordova, John Cortina, Siro Cortina, Gina DeCotiis, Adam Dible, Linda Durkin, Carol E. Emerson, Ross Frederickson, Eugene Gnidovec, Michael Gnidovec, Phil Heidrick, Mary Helton, Plaintiff B.H. , Sheryl Hughes, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, Chastity Johnson, Plaintiff D.J.,  Plaintiff S.J., Michael Killups, Angela King, Damon LaForce, Ronald Lecomte, Michael Lezon, Chris Long, Carolyn Lubker, James Matthews, Scott Patrick, Garrett Rawinsky, Jon Rawinsky, Courtney Reddick, Megan Shefke, Bradford Stevens, Linda Strange, Michael Sico, Teresa Viers, Joseph Wallace, Willete Toby Wehunt, Shashone Weise, Plaintiff B.W., Laura Winchester, Trina Wilkins, Plaintiff N.L., Sandra Wilkins, Jason Wrobleski, and Marc Wrobleski have suffered damages as set forth herein in Count IV.

WHEREFORE, Plaintiffs Philip Adamo, James Beadnell, Joy Beadnell, Patricia Been, Mercedes Been, James Bishop, Stephanie Briones, Plaintiff J.B., Kristina Bohannon, Plaintiff I.B.F.,  Plaintiff I.B.M., Lynsey Callahan, Toni Cordova, John Cortina, Siro Cortina, Gina

DeCotiis, Adam Dible, Linda Durkin, Carol E. Emerson, Ross Frederickson, Eugene Gnidovec, Michael Gnidovec, Phil Heidrick, Mary Helton, Plaintiff B.H. , Sheryl Hughes, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, Chastity Johnson,  Plaintiff D.J.,  Plaintiff S.J., Michael Killups, Angela King, Damon LaForce, Ronald Lecomte, Michael Lezon, Chris Long, Carolyn Lubker, James Matthews, Scott Patrick, Garrett Rawinsky, Jon Rawinsky, Courtney Reddick, Megan Shefke, Bradford Stevens, Linda Strange, Michael Sico, Teresa Viers, Joseph Wallace, Willete Toby Wehunt, Shashone Weise, Plaintiff B.W., Laura Winchester, Trina Wilkins, Plaintiff N.L., Sandra Wilkins, Jason Wrobleski, and Marc Wrobleski demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with costs of suit.  <u>JURY TRIAL DEMANDED</u>.

## COUNT V: VIOLATION OF ARIZONA CONSUMER FRAUD ACT (A.R.S. § 44-1522 (Supp.2009) *et seq.*)
### JAMES BEADNELL; GINA DECOTIIS; PLAINTIFF B.W.; AND LAURA WINCHESTER v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

246.   Paragraphs 1 through 245 are incorporated hereunder as though fully set forth at length.

247.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

   a. in failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the observed and possible consequences of such unapproved and unauthorized use;
   b. in affirmatively representing that the drug given at diluted dosage and, further, contaminated with virus, glass, rubber, and steel particles is approved to successfully treat Fabry disease and Fabry disease patients will benefit from such use;

    c.  in willfully including an incorrect and unapproved product insert  that does not apply to a diluted dosage;

    d.  in affirmatively representing that the drug given at full dosage would be sold to Arizona citizens at various dates, but breached such promises repeatedly since June 2009;

    e.  in barring physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert; and

    f.  in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use.

248.  By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs James Beadnell, Gina DeCotiis, Plaintiff B.W., and Laura Winchester, as set forth herein in Count V.

249.  As a direct and proximate result of the aforesaid injuries, James Beadnell, Gina DeCotiis, Plaintiff B.W., and Laura Winchester, have suffered damages, as set forth herein in Count V.

WHEREFORE, Plaintiffs James Beadnell, Gina DeCotiis, Plaintiff B.W., and Laura Winchester demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit. <u>JURY TRIAL DEMANDED</u>.

### COUNT VI: VIOLATION OF ARIZONA PRODUCTS LIABILITY STATUTE (A.R.S. § 12-681)
### JAMES BEADNELL; GINA DECOTIIS; PLAINTIFF B.W.; AND LAURA WINCHESTER v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

250.  Paragraphs 1 through 249 are incorporated hereunder as though fully set forth at length.

251.  All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants' practices regarding the manufacture, sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

a.  in that the Defendants failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;

b.  in that the Defendants failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

c.  in that the Defendants failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;

d.  in that the Defendants manufactured and sold defective Fabrazyme® vials contaminated with virus, glass, rubber and steel particles;

e.  in that the Defendants unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physicians (including those employed by Defendant Mount Sinai) recommending a lawful and approved dose;

f.  in that the Defendants designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens equally and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

g.  in that the Defendants instructed physicians and patients to use a reduced the dose of Fabrazyme® that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

h.  in that the Defendants barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i.  in that the Defendants failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

j.  in that the Defendants failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

k.  in that the Defendants failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

l.  in that the Defendants failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

m.  in that the Defendants failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n.  in that the Defendants affirmatively represented that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o.  in that the Defendants expressly or impliedly misrepresented that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.  in affirmatively representing that the drug given at full dosage would be sold to Arizona citizens at various dates, but breached such promises repeatedly since June 2009;

q.  in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.  in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

s.  in that the Defendants failed to adequately, properly, and timely test the diluted dose prior to use;

t.  in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

u.  in that the Defendants knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

v.  in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w.  in that the Defendants knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the recommended dose;

x.  in that the Defendants  knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y.  in that the Defendants did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users of known or knowable dangers;

z.  in that the Defendants did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa. in that the Defendants willfully included an incorrect and unapproved product insert  that does not apply to a diluted dosage;

bb. in that the Defendants knew or should have known that physicians and users were relying upon the expertise of the Defendants in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

cc. in that the Defendants expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

dd. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

252.    By its actions, Defendants are liable for the severe injuries and conditions of Plaintiffs James Beadnell, Gina DeCotiis, Plaintiff B.W., and Laura Winchester as set forth herein in Count VI.

253.    As a direct and proximate result of the aforesaid injuries, Plaintiffs James Beadnell, Gina DeCotiis, Plaintiff B.W., and Laura Winchester, have suffered damages as set forth herein in Count VI.

WHEREFORE, Plaintiffs James Beadnell, Gina DeCotiis, Plaintiff B.W., and Laura Winchester, demand judgment against Defendants Genzyme Corporation and Mt. Sinai in an amount in excess of $75,000.00, together with punitive damages and costs of suit.   <u>JURY TRIAL DEMANDED</u>.

### <u>COUNT VII: CALIFORNIA BUSINESS AND PROFESSIONAL CODE VIOLATION (CAL. BPC CODE § 17500 *et seq.*)</u><br>STEPHANIE BRIONES; PLAINTIFF J.B.; PHIL HEIDRICK; JON RAWINSKY; GARRET RAWINSKY; COURTNEY REDDICK; AND SHASHONE WEISE v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

254.    Paragraphs 1 through 253 are incorporated hereunder as though fully set forth at length.

255.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's unfair trade acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

    a.  in failing to inform the Plaintiff that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use;

    b.  in affirmatively representing that the drug given at diluted dosage and, further, contaminated with virus, glass, rubber and steel particles is approved to successfully treat Fabry disease and Fabry disease patients will benefit from such use;

    c.  in willfully including an incorrect and unapproved product insert  that does not

apply to a diluted dosage;

    d.   in affirmatively representing that the drug given at full dosage would be sold to California citizens at various dates, but breached such promises repeatedly since June 2009;

    e.   in barring physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert; and

    f.   in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was in accordance with statutory mandates and efficacious for use.

256.    By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Stephanie Briones, Plaintiff J.B., Phil Heidrick, Jon Rawinsky, Garret Rawinsky, Courtney Reddick, and Shashone Weise, as set forth herein in Count VII.

257.    As a direct and proximate result of the aforesaid injuries, Stephanie Briones, Plaintiff J.B., Phil Heidrick, Jon Rawinsky, Garret Rawinsky, Courtney Reddick, and Shashone Weise, have suffered injuries, as set forth herein in Count VII.

WHEREFORE, Plaintiffs Stephanie Briones, Plaintiff J.B., Phil Heidrick, Jon Rawinsky, Garret Rawinsky, Courtney Reddick, and Shashone Weise, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with costs of suit as well as an award of such other and further legal or equitable relief this court deems just and proper. <u>JURY TRIAL DEMANDED</u>.

### <u>COUNT VIII: VIOLATION OF CONNECTICUT PRODUCT LIABILITY ACT,</u> <u>(G.S.</u> <u>§ 52-572m</u> *et seq.*<u>)</u>
### PHIL ADAMO AND MICHAEL LEZON v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

258.    Paragraphs 1 through 257 are incorporated hereunder as though fully set forth at length.

259.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants' practices regarding the manufacture, testing, sale and

use of the drug, Fabrazyme®, generally, and in the following particulars:

    a. in that the Defendants failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;

    b. in that the Defendants failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

    c. in that the Defendants failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;

    d. in that the Defendants manufactured and sold defective Fabrazyme® vials contaminated with virus, glass, rubber and steel particles;

    e. in that the Defendants unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physicians (including those employed by Defendant Mount Sinai) recommending a lawful and approved dose;

    f. in that the Defendants designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens equally and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

    g. in that the Defendants instructed physicians and patients to use a reduced the dose of Fabrazyme® that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

    h. in that the Defendants barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

    i. in that the Defendants failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

    j. in that the Defendants failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

    k. in that the Defendants failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

    l. in that the Defendants failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

    m. in that the Defendants failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

    n. in that the Defendants affirmatively represented that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

    o. in that the Defendants expressly or impliedly misrepresented that the diluted dose

and adulterated Fabrazyme® was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.  in affirmatively representing that the drug given at full dosage would be sold to Connecticut citizens at various dates, but breached such promises repeatedly since June 2009;

q.  in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.  in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

s.  in that the Defendants failed to adequately, properly, and timely test the diluted dose prior to use;

t.  in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

u.  in that the Defendants knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

v.  in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w.  in that the Defendants knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the recommended dose;

x.  in that the Defendants  knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y.  in that the Defendants did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users of known or knowable dangers;

z.  in that the Defendants did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa. in that the Defendants willfully included an incorrect and unapproved product insert  that does not apply to a diluted dosage;

bb. in that the Defendants knew or should have known that physicians and users were relying upon the expertise of the Defendants in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

cc. in that the Defendants expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

dd. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

260.  By its actions, Defendants are liable for the severe injuries and conditions of Plaintiffs Philip Adamo and Michael Lezon, as set forth herein in Count VIII.

261.  As a direct and proximate result of the aforesaid injuries, Philip Adamo and Michael Lezon have suffered damages, as set forth herein in Count VIII.

WHEREFORE, Plaintiffs Philip Adamo and Michael Lezon demand judgment against Defendants Genzyme Corporation and Mt. Sinai in an amount in excess of $75,000.00, together with costs of costs of suit as well as an award of such other and further legal or equitable relief this court deems just and proper. <u>JURY TRIAL DEMANDED.</u>

### <u>COUNT IX: CONNECTICUT UNFAIR TRADE PRACTICES ACT VIOLATION</u><br><u>(Ct. Gen. Stat. 735a-42-110a *et seq*).</u><br>PHILIP ADAMO AND MICHAEL LEZON v. GENZYME CORPORATION AND<br>MOUNT SINAI SCHOOL OF MEDICINE

262.  Paragraphs 1 through 261 are incorporated hereunder as though fully set forth at length.

263.  All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or practices regarding the sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

   a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

   b.  in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

   c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg <u>every two weeks</u> as detailed in the label;

    d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Connecticut citizens at various dates, but breached such promises repeatedly since June 2009;

    e.  in barring Connecticut physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barred Connecticut Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

    f.  in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

264.  By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Philip Adamo and Michael Lezon, as set forth herein in Count IX.

265.  As a direct and proximate result of the aforesaid injuries, Philip Adamo and Michael Lezon have suffered damages, as set forth herein in Count IX.

WHEREFORE, Plaintiffs Philip Adamo and Michael Lezon demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with costs of costs of suit as well as an award of such other and further legal or equitable relief this court deems just and proper. JURY TRIAL DEMANDED.

### COUNT X: ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT VIOLATION (815 ILCS § 510 (1) *et seq.*) LINDA DURKIN v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

266.  Paragraphs 1 through 265 are incorporated hereunder as though fully set forth at length.

267.  All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

b.  in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Illinois citizens at various dates, but breached such promises repeatedly since June 2009;

e.  in barring Illinois physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Illinois Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

f.  in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

268.  By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff Linda Durkin, as set forth herein in Count X.

269.  As a direct and proximate result of the aforesaid injuries, Linda Durkin has suffered damages, as set forth herein in Count X.

WHEREFORE, Plaintiff Linda Durkin, demands judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with costs of costs of suit as well as an award of such other and further legal or equitable relief this court deems just and proper. JURY TRIAL DEMANDED.

## COUNT XI: INDIANA PRODUCTS LIABILITY ACT VIOLATION (I.C. § 34-20-1-1 et seq.)

**PATRICIA BEEN; MERCEDES BEEN; KRISTINA BOHANNON; PLAINTIFF I.B.F.; PLAINTIFF I.B.M.; ROSS FREDERICKSON; MARY HELTON; PLAINTIFF D.H.; AND SANDRA WILKINS v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE**

270.   Paragraphs 1 through 269 are incorporated hereunder as though fully set forth at length.

271.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants Genzyme's practices regarding the manufacture, sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

    a.   in that the Defendants failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;

    b.   in that the Defendants failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

    c.   in that the Defendants failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;

    d.   in that the Defendants manufactured and sold defective Fabrazyme® vials contaminated with virus, glass, rubber and steel particles;

    e.   in that the Defendants unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physicians (including those employed by Defendant Mount Sinai) recommending a lawful and approved dose;

    f.   in that the Defendants designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens equally and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

    g.   in that the Defendants instructed physicians and patients to use a reduced the dose of Fabrazyme® that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

    h.   in that the Defendants barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

    i.   in that the Defendants failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

    j.   in that the Defendants failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

    k.   in that the Defendants failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

    l.   in that the Defendants failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

    m.   in that the Defendants failed to inform the Plaintiffs that the dosage given was

unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n. in that the Defendants affirmatively represented that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o. in that the Defendants expressly or impliedly misrepresented that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p. in affirmatively representing that the drug given at full dosage would be sold to Indiana citizens at various dates, but breached such promises repeatedly since June 2009;

q. in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r. in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

s. in that the Defendants failed to adequately, properly, and timely test the diluted dose prior to use;

t. in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

u. in that the Defendants knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

v. in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w. in that the Defendants knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the recommended dose;

x. in that the Defendants  knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y. in that the Defendants did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users of known or knowable dangers;

z. in that the Defendants did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa. in that the Defendants willfully included an incorrect and unapproved product insert  that does not apply to a diluted dosage;

bb. in that the Defendants knew or should have known that physicians and users were

relying upon the expertise of the Defendants in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

cc. in that the Defendants expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

dd. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

272.  By its actions, Defendants are liable for the severe injuries and conditions of Plaintiffs Patricia Been, Mercedes Been, Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Ross Frederickson, Mary Helton, Plaintiff D.H., and Sandra Wilkins, as set forth herein in Count XI.

273.  As a direct and proximate result of the aforesaid injuries, Patricia Been, Mercedes Been, Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Ross Frederickson, Mary Helton, Plaintiff D.H., and Sandra Wilkins have suffered damages, as set forth herein in Count XI.

WHEREFORE, Plaintiffs Patricia Been, Mercedes Been, Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Ross Frederickson, Mary Helton, Plaintiff D.H., and Sandra Wilkins demand judgment against Defendants Genzyme Corporation and Mt. Sinai in an amount in excess of $75,000.00, together with costs of suit.   <u>JURY TRIAL DEMANDED.</u>

### <u>COUNT XII: INDIANA DECEPTIVE TRADE PRACTICES ACT VIOLATION<br>(I.C. § 24-5-0.5-1 *et seq.*)</u>
### PATRICIA BEEN; MERCEDES BEEN; KRISTINA BOHANNON; PLAINTIFF I.B.F.; PLAINTIFF I.B.M.; ROSS FREDERICKSON; MARY HELTON; PLAINTIFF D.H.; AND SANDRA WILKINS v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

274.  Paragraphs 1 through 273 are incorporated hereunder as though fully set forth at length.

275.  All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or

practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

    a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

    b.  in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

    c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

    d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Indiana citizens at various dates, but breached such promises repeatedly since June 2009;

    e.  in barring Indiana physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Indiana Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

    f.  in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

276.    By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Patricia Been, Mercedes Been, Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Ross Frederickson, Mary Helton, Plaintiff D.H., and Sandra Wilkins, as set forth herein in Count XII.

277.    As a direct and proximate result of the aforesaid injuries of Plaintiffs Patricia Been, Mercedes Been, Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Ross Frederickson, Mary Helton, Plaintiff D.H., and Sandra Wilkins have suffered damages, as set forth herein in Count XII.

WHEREFORE, Plaintiffs Patricia Been, Mercedes Been, Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Ross Frederickson, Mary Helton, Plaintiff D.H., and Sandra Wilkins

demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with costs of suit.

<u>JURY TRIAL DEMANDED</u>.

## COUNT XIII: PRODUCT LIABILITY ACT OF KENTUCKY VIOLATION (KY. REV. STAT. §411.300 *et seq.*)
### ANGELA KING; LINDA STRANGE; PLAINTIFF N.L., AND TRINA WILKINS v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

278.    Paragraphs 1 through 277 are incorporated hereunder as though fully set forth at length.

279.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendant Genzyme's practices regarding the manufacture, sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

    a.  in that the Defendants failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;

    b.  in that the Defendants failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

    c.  in that the Defendants failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;

    d.  in that the Defendants manufactured and sold defective Fabrazyme® vials contaminated with virus, glass, rubber and steel particles;

    e.  in that the Defendants unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physicians (including those employed by Defendant Mount Sinai) recommending a lawful and approved dose;

    f.  in that the Defendants designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens equally and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

    g.  in that the Defendants instructed physicians and patients to use a reduced the dose of Fabrazyme® that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

    h.  in that the Defendants barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i.   in that the Defendants failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

j.   in that the Defendants failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

k.   in that the Defendants failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

l.   in that the Defendants failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

m.  in that the Defendants failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n.   in that the Defendants affirmatively represented that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o.   in that the Defendants expressly or impliedly misrepresented that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.   in affirmatively representing that the drug given at full dosage would be sold to Kentucky citizens at various dates, but breached such promises repeatedly since June 2009;

q.   in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.   in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

s.   in that the Defendants failed to adequately, properly, and timely test the diluted dose prior to use;

t.   in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

u.   in that the Defendants knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

v.   in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w.   in that the Defendants knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the recommended dose;

x.   in that the Defendants  knew or should have known, that due to the inherently

- 72 -

dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y.   in that the Defendants did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users of known or knowable dangers;

z.   in that the Defendants did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa.   in that the Defendants willfully included an incorrect and unapproved product insert  that does not apply to a diluted dosage;

bb.   in that the Defendants knew or should have known that physicians and users were relying upon the expertise of the Defendants in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

cc.   in that the Defendants expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

dd.   in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

280.   By its actions, Defendants are liable for the severe injuries and conditions of Plaintiffs Angela King, Linda Strange, Plaintiff N.L., and Trina Wilkins, as set forth herein in Count XIII.

281.   As a direct and proximate result of the aforesaid injuries, Angela King, Linda Strange, Plaintiff N.L., and Trina Wilkins have suffered damages, as set forth herein in Count XIII.

WHEREFORE, Plaintiffs Angela King, Linda Strange, Plaintiff N.L., and Trina Wilkins demand judgment against Defendants Genzyme Corporation and Mt. Sinai in an amount in excess of $75,000.00, together with punitive damages where appropriate, and costs of suit.

JURY TRIAL DEMANDED.

### COUNT XIV: KENTUCKY CONSUMER PROTECTION ACT VIOLATION (KRS § 367.110 *et seq*)
### ANGELA KING; LINDA STRANGE; AND TRINA WILKINS v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

282.   Paragraphs 1 through 281 are incorporated hereunder as though fully set forth at length.

283.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

   a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

   b.  in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

   c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

   d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Kentucky citizens at various dates, but breached such promises repeatedly since June 2009;

   e.  in barring Kentucky physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Kentucky Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

   f.  in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

284.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Angela King, Linda Strange, and Trina Wilkins, as set forth herein in Count XIV.

285.   As a direct and proximate result of the aforesaid injuries of Plaintiffs Angela King, Linda Strange, and Trina Wilkins have suffered damages, as set forth herein in Count XIV.

   WHEREFORE, Plaintiff Plaintiffs Angela King, Linda Strange, and Trina Wilkins demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with punitive damages where appropriate, and costs of suit. JURY TRIAL DEMANDED.

- 74 -

**COUNT XV:  MASSACHUSETTS UNFAIR AND DECEPTIVE TRADE PRACTICES ACT VIOLATION (Mass. Gen. Laws Ch. 93A § 1 *et seq.*) JAMES BISHOP; MICHAEL KILLUPS; MICHAEL SICO; JASON WROBLESKI; AND MARC WROBLESKI, v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE**

286.   Paragraphs 1 through 285 are incorporated hereunder as though fully set forth at length.

287.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or egregious practices

   a.   in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;
   b.   in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;
   c.   in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;
   d.   in affirmatively representing that the drug given at full dosage every two weeks would be sold to Massachusetts citizens at various dates, but breached such promises repeatedly since June 2009;
   e.   in barring Massachusetts physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Massachusetts Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and
   f.   in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

288.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs James Bishop, Michael Killups, Michael Sico, Jason Wrobleski, and Michael Wrobleski, as set forth herein in Count XV.

289.   As a direct and proximate result of the aforesaid injuries, James Bishop, Michael Killups, Michael Sico, Jason Wrobleski, and Marc Wrobleski have suffered damages, as set forth

herein in Count XV.

WHEREFORE, Plaintiffs James Bishop, Michael Killups, Michael Sico, Jason Wrobleski, and Marc Wrobleski demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit.  <u>JURY TRIAL DEMANDED</u>.

<u>COUNT XVI: MICHIGAN STATE PRODUCT LIABILITY ACT VIOLATION<br>(M.C.L. 600.2946 <em>et seq.</em>)</u><br>
<strong>JEANNETTE HYATT; KEVIN HYATT; MARGARET HYATT; AND MEGAN SHEFKE v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE</strong>

290.   Paragraphs 1 through 289 are incorporated hereunder as though fully set forth at length.

291.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants' practices regarding the manufacture, sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

  a. in that the Defendants failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;
  b. in that the Defendants failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;
  c. in that the Defendants failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;
  d. in that the Defendants manufactured and sold defective Fabrazyme® vials contaminated with virus, glass, rubber and steel particles;
  e. in that the Defendants unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physicians (including those employed by Defendant Mount Sinai) recommending a lawful and approved dose;
  f. in that the Defendants designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens equally and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;
  g. in that the Defendants instructed physicians and patients to use a reduced the dose of Fabrazyme® that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the

drug left the control of the manufacturer or seller;

h. in that the Defendants barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i. in that the Defendants failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

j. in that the Defendants failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

k. in that the Defendants failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

l. in that the Defendants failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

m. in that the Defendants failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n. in that the Defendants affirmatively represented that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o. in that the Defendants expressly or impliedly misrepresented that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p. in affirmatively representing that the drug given at full dosage would be sold to Michigan citizens at various dates, but breached such promises repeatedly since June 2009;

q. in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r. in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

s. in that the Defendants failed to adequately, properly, and timely test the diluted dose prior to use;

t. in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

u. in that the Defendants knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

v. in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w. in that the Defendants knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the recommended dose;

x. in that the Defendants knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y. in that the Defendants did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users of known or knowable dangers;

z. in that the Defendants did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa. in that the Defendants willfully included an incorrect and unapproved product insert that does not apply to a diluted dosage;

bb. in that the Defendants knew or should have known that physicians and users were relying upon the expertise of the Defendants in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

cc. in that the Defendants expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

dd. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

292. By its actions, Defendants are liable for the severe injuries and conditions of Plaintiffs Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, and Megan Shefke, as set forth herein in Count XVI.

293. As a direct and proximate result of the aforesaid injuries, Plaintiffs Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, and Megan Shefke have suffered damages, as set forth herein in Count XVI.

WHEREFORE, Plaintiffs Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, and Megan Shefke demand judgment against Defendants Genzyme Corporation and Mt. Sinai in an amount in excess of $75,000.00, together with costs of suit.   JURY TRIAL DEMANDED.

### COUNT XVII: MICHIGAN STATE LAW DECEPTIVE TRADE PRACTICE VIOLATION (MICHIGAN COMPILED LAWS § 445.903 *et seq.*)
### JEANNETTE HYATT; KEVIN HYATT; MARGARET HYATT; AND MEGAN SHEFKE v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

294.   Paragraphs 1 through 293 are incorporated hereunder as though fully set forth at length.

295.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or practices regarding the sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

    a.   in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

    b.   in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

    c.   in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

    d.   in affirmatively representing that the drug given at full dosage every two weeks would be sold to Michigan citizens at various dates, but breached such promises repeatedly since June 2009;

    e.   in barring Michigan physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Michigan Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

    f.   in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

296.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, and Megan Shefke, as set forth herein in Count XVII.

297.   As a direct and proximate result of the aforesaid injuries, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, and Megan Shefke have suffered damages, as set forth herein in Count XVII.

WHEREFORE, Plaintiffs Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, and Megan Shefke demand judgment against Defendants Genzyme Corporation and Mount Sinai School of

Medicine, jointly and severally in an amount in excess of $75,000.00, together with costs of suit.

JURY TRIAL DEMANDED.

## COUNT XVIII:  MINNESOTA UNLAWFUL TRADE PRACTICES ACT VIOLATION
### (Minn. Stat. § 325D.09 *et. seq.*)
### CAROLYN LUBKER, v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

298.    Paragraphs 1 through 297 are incorporated hereunder as though fully set forth at length.

299.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or egregious practices

   a. in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;
   b. in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;
   c. in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;
   d. in affirmatively representing that the drug given at full dosage every two weeks would be sold to Minnesota citizens at various dates, but breached such promises repeatedly since June 2009;
   e. in barring Minnesota physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Minnesota Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and
   f. in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

300.    By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff Carolyn Lubker, as set forth herein in Count XVIII.

301.    As a direct and proximate result of the aforesaid injuries, Carolyn Lubker has suffered damages, as set forth herein in Count XVIII.

WHEREFORE, Plaintiff Carolyn Lubker demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00. JURY TRIAL DEMANDED.

### COUNT XIX:  NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT VIOLATION (Neb. Rev. Stat. § 87-301 *et. seq.*)
### CHRIS LONG v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

302.   Paragraphs 1 through 301 are incorporated hereunder as though fully set forth at length.

303.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or egregious practices

  a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

  b.  in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

  c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

  d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Nebraska citizens at various dates, but breached such promises repeatedly since June 2009;

  e.  in barring Nebraska physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Nebraska Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

  f.  in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

304.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff Chris Long, as set forth herein in Count XIX.

305.   As a direct and proximate result of the aforesaid injuries, Chris Long has suffered

damages, as set forth herein in Count XIX.

WHEREFORE, Plaintiff Chris Long demands judgment against Defendants Genzyme

Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of

$75,000.00, together with treble damages and costs of suit.  JURY TRIAL DEMANDED

## COUNT XX: NEBRASKA PRODUCT LIABILITY ACT VIOLATION
### (Neb. Rev. Stat.  §  25-21 (181) and (182))
### CHRIS LONG v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

306.    Paragraphs 1 through 305 are incorporated hereunder as though fully set forth at length.

307.    All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly

and proximately from Defendants Genzyme's practices regarding the manufacture, sale

and use of the drug, Fabrazyme®, generally, and in the following particulars:

   a.  in that the Defendants failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;

   b.  in that the Defendants failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

   c.  in that the Defendants failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;

   d.  in that the Defendants manufactured and sold defective Fabrazyme® vials contaminated with virus, glass, rubber and steel particles;

   e.  in that the Defendants unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physicians (including those employed by Defendant Mount Sinai) recommending a lawful and approved dose;

   f.  in that the Defendants designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens equally and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

   g.  in that the Defendants instructed physicians and patients to use a reduced the dose of Fabrazyme® that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

   h.  in that the Defendants barred physicians from administering the prescribed and

lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i.  in that the Defendants failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

j.  in that the Defendants failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

k.  in that the Defendants failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

l.  in that the Defendants failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

m.  in that the Defendants failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n.  in that the Defendants affirmatively represented that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o.  in that the Defendants expressly or impliedly misrepresented that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.  in affirmatively representing that the drug given at full dosage would be sold to Nebraska citizens at various dates, but breached such promises repeatedly since June 2009;

q.  in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.  in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

s.  in that the Defendants failed to adequately, properly, and timely test the diluted dose prior to use;

t.  in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

u.  in that the Defendants knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

v.  in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w.  in that the Defendants knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the

- 83 -

recommended dose;

x.  in that the Defendants knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y.  in that the Defendants did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users of known or knowable dangers;

z.  in that the Defendants did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa. in that the Defendants willfully included an incorrect and unapproved product insert that does not apply to a diluted dosage;

bb. in that the Defendants knew or should have known that physicians and users were relying upon the expertise of the Defendants in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

cc. in that the Defendants expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

dd. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

308.  By its actions, Defendants are liable for the severe injuries and conditions of Plaintiff

Chris Long, as set forth herein in Count XX.

309.  As a direct and proximate result of the aforesaid injuries, Chris Long has suffered

damages, as set forth herein in Count XX.

WHEREFORE, Plaintiff Chris Long demands judgment against Defendants Genzyme

Corporation and Mt. Sinai in an amount in excess of $75,000.00, together with punitive

damages, and costs of suit.   <u>JURY TRIAL DEMANDED</u>.

<u>COUNT XXI: NEVADA STATE LAW DECEPTIVE TRADE PRACTICE
VIOLATION (N. R. S. §§ 598.0903-0990)</u>
**TONI CORDOVA v. GENZYME CORPORATION AND MOUNT SINAI
SCHOOL OF MEDICINE**

310.  Paragraphs 1 through 309 are incorporated hereunder as though fully set forth at length.

311.  All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly

and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or

practices regarding the sale and use of the drug, Fabrazyme®, generally, and in the following particulars:

    a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

    b.  in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

    c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

    d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Nevada citizens at various dates, but breached such promises repeatedly since June 2009;

    e.  in barring Nevada physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Nevada Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

    f.  in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

312.    By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff Toni Cordova, as set forth herein in Count XXI.

313.    As a direct and proximate result of the aforesaid injuries, Toni Cordova has suffered damages, as set forth herein in Count XXI.

    WHEREFORE, Plaintiff Toni Cordova demands judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally for damages deriving from Defendant's actions in an amount in excess of $75,000.00.   <u>JURY TRIAL DEMANDED</u>.

## COUNT XXII: NEW MEXICO UNFAIR TRADE PRACTICES ACT VIOLATION
### (N.M.S. § 57-12-1 *et seq.*)
### CAROL EMERSON v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

314.   Paragraphs 1 through 313 are incorporated hereunder as though fully set forth at length.

315.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

   a.   in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

   b.   in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

   c.   in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

   d.   in affirmatively representing that the drug given at full dosage every two weeks would be sold to New Mexico citizens at various dates, but breached such promises repeatedly since June 2009;

   e.   in barring New Mexico physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring New Mexico Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

   f.   in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

316.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff Carol Emerson, as set forth herein in Count XXII.

317.   As a direct and proximate result of the aforesaid injuries, Carol Emerson has suffered damages, as set forth herein in Count XXII.

   WHEREFORE, Plaintiff Carol Emerson demands judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit. JURY TRIAL DEMANDED.

**COUNT XXIII: NEW YORK DECEPTIVE TRADE PRACTICES ACT
VIOLATION (N.Y. GEN. BUS. LAW § 350-A. *et seq.*)
JOHN CORTINA AND SIRO CORTINA v. GENZYME CORPORATION AND
MOUNT SINAI SCHOOL OF MEDICINE**

318. Paragraphs 1 through 317 are incorporated hereunder as though fully set forth at length.

319. All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

   a. in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

   b. in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

   c. in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

   d. in affirmatively representing that the drug given at full dosage every two weeks would be sold to New York citizens at various dates, but breached such promises repeatedly since June 2009;

   e. in barring New York physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring New York Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

   f. in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

320. By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs John Cortina and Siro Cortina, as set forth herein in Count XXIII.

321. As a direct and proximate result of the aforesaid injuries, John Cortina and Siro Cortina have suffered damages, as set forth herein in Count XXIII.

   WHEREFORE, Plaintiffs John Cortina and Siro Cortina demand judgment against

Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit. JURY TRIAL DEMANDED.

### COUNT XXIV: NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT VIOLATION (N.C.G.S. § 75-1.1 *et seq.*) PLAINTIFF B.H., SHERYL HUGHES; JAMES MATTHEWS; AND BRADFORD STEVENS v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

322.    Paragraphs 1 through 321 are incorporated hereunder as though fully set forth at length.

323.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants' Genzyme and Mount Sinai's deceptive acts or egregious practices:

  a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

  b.  in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

  c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

  d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to North Carolina citizens at various dates, but breached such promises repeatedly since June 2009;

  e.  in barring North Carolina physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring North Carolina Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

  f.  in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

324.     By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Plaintiff B.H., Sheryl Hughes, James Matthews and Bradford Stevens, as set forth herein in Count XXIV.

325.    As a direct and proximate result of the aforesaid injuries, Plaintiff B.H., Sheryl Hughes,

James Matthews, and Bradford Stevens have suffered damages, as set forth herein in

Count XXIV.

WHEREFORE, Plaintiffs B.H., Sheryl Hughes, James Matthews and Bradford Stevens

demand judgment against Defendants Genzyme Corporation and Mount Sinai School of

Medicine, jointly and severally in an amount in excess of $75,000.00, together with treble

damages and costs of suit.  JURY TRIAL DEMANDED.

### COUNT XXV: OHIO PRODUCT LIABILITY ACT VIOLATION
### (O.R.C. § 2307.71 *et seq.*)
### ADAM DIBLE; EUGENE GNIDOVEC; MICHAEL GNIDOVEC; AND SCOTT PATRICK v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

326.    Paragraphs 1 through 325 are incorporated hereunder as though fully set forth at length.

327.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly

and proximately from Defendant Genzyme's practices regarding the manufacture, sale

and use of the drug, Fabrazyme®, generally, and in the following particulars:

a.  in that the Defendants failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;

b.  in that the Defendants failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

c.  in that the Defendants failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;

d.  in that the Defendants manufactured and sold defective Fabrazyme® vials contaminated with virus, glass, rubber and steel particles;

e.  in that the Defendants unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physicians (including those employed by Defendant Mount Sinai) recommending a lawful and approved dose;

f.  in that the Defendants designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens equally and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent

No. 5,356,804;

g.  in that the Defendants instructed physicians and patients to use a reduced the dose of Fabrazyme® that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

h.  in that the Defendants barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i.  in that the Defendants failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

j.  in that the Defendants failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

k.  in that the Defendants failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

l.  in that the Defendants failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

m.  in that the Defendants failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n.  in that the Defendants affirmatively represented that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o.  in that the Defendants expressly or impliedly misrepresented that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.  in affirmatively representing that the drug given at full dosage would be sold to Ohio citizens at various dates, but breached such promises repeatedly since June 2009;

q.  in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.  in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

s.  in that the Defendants failed to adequately, properly, and timely test the diluted dose prior to use;

t.  in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

u.  in that the Defendants knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

v.  in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w.  in that the Defendants knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the recommended dose;

x.  in that the Defendants  knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y.  in that the Defendants did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users of known or knowable dangers;

z.  in that the Defendants did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa. in that the Defendants willfully included an incorrect and unapproved product insert  that does not apply to a diluted dosage;

bb. in that the Defendants knew or should have known that physicians and users were relying upon the expertise of the Defendants in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

cc. in that the Defendants expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

dd. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

328.  By its actions, Defendants are liable for the severe injuries and conditions of Plaintiffs Adam Dible, Eugene Gnidovec, Michael Gnidovec, and Scott Patrick, as set forth herein in Count XXV.

329.  As a direct and proximate result of the aforesaid injuries, Adam Dible, Eugene Gnidovec, Michael Gnidovec, and Scott Patrick have suffered damages, as set forth herein in Count XXV.

WHEREFORE, Plaintiffs Adam Dible, Eugene Gnidovec, Michael Gnidovec, and Scott Patrick demand judgment against Defendants Genzyme Corporation and Mt. Sinai in an amount in excess of $75,000.00 and costs of suit.   JURY TRIAL DEMANDED.

**COUNT XXVI: OHIO DECEPTIVE TRADE PRACTICES ACT VIOLATION**
**(O.R.C. § 4165.01 *et seq.*)**
**ADAM DIBLE; EUGENE GNIDOVEC; MICHAEL GNIDOVEC; AND SCOTT**
**PATRICK v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF**
**MEDICINE**

330. Paragraphs 1 through 329 are incorporated hereunder as though fully set forth at length.

331. All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

    a. in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

    b. in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

    c. in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

    d. in affirmatively representing that the drug given at full dosage every two weeks would be sold to Ohio citizens at various dates, but breached such promises repeatedly since June 2009;

    e. in barring Ohio physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Ohio Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

    f. in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

332. By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Adam Dible, Eugene Gnidovec, Michael Gnidovec, and Scott Patrick, as set forth herein in Count XXVI.

333. As a direct and proximate result of the aforesaid injuries of Plaintiffs Adam Dible, Eugene Gnidovec, Michael Gnidovec, and Scott Patrick have suffered damages, as set

forth herein in Count XXVI.

WHEREFORE, Plaintiffs Adam Dible, Eugene Gnidovec, Michael Gnidovec, and Scott Patrick demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, and costs of suit. JURY TRIAL DEMANDED.

### COUNT XXVII: PENNSYLVANIA UNFAIR TRADE PRACTICES CONSUMER PROTECTION LAW VIOLATION (73 P.S. §§201-1 - 201-9.2) RONALD LECOMTE v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

334.   Paragraphs 1 through 333 are incorporated hereunder as though fully set forth at length.

335.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

   a.   in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;
   b.   in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;
   c.   in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;
   d.   in affirmatively representing that the drug given at full dosage every two weeks would be sold to Pennsylvania citizens at various dates, but breached such promises repeatedly since June 2009;
   e.   in barring Pennsylvania physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Pennsylvania Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and
   f.   in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

336.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff Ronald LeComte, as set forth herein in Count XXVII.

337.   As a direct and proximate result of the aforesaid injuries, Ronald LeComte has suffered damages, as set forth herein in Count XXVII.

WHEREFORE, Plaintiff Ronald LeComte demands judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit. <u>JURY TRIAL DEMANDED</u>.

## <u>COUNT XXVIII: SOUTH CAROLINA PRODUCT LIABILITY ACT VIOLATION</u><br>(S.C.Code § 15-73-10 *et seq.*)<br>WILLETTE TOBY WEHUNT v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

338.   Paragraphs 1 through 337 are incorporated hereunder as though fully set forth at length.

339.   All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants' practices regarding the manufacture, sale, contract for sale, licensing and use of the drug, Fabrazyme®, generally, and in the following particulars:

   a.   in that the Defendants failed to take reasonable steps to avoid and prevent viral contamination in the Genzyme Allston, MA plant;
   b.   in that the Defendants failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;
   c.   in that the Defendants failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;
   d.   in that the Defendants manufactured and sold defective Fabrazyme® vials contaminated with virus, glass, rubber and steel particles;
   e.   in that the Defendants unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physicians (including those employed by Defendant Mount Sinai) recommending a lawful and approved dose;
   f.   in that the Defendants designed and implemented the Genzyme Rationing Plan

despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens equally and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

g.  in that the Defendants instructed physicians and patients to use a reduced the dose of Fabrazyme® that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

h.  in that the Defendants barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i.  in that the Defendants failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

j.  in that the Defendants failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

k.  in that the Defendants failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

l.  in that the Defendants failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

m.  in that the Defendants failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n.  in that the Defendants affirmatively represented that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o.  in that the Defendants expressly or impliedly misrepresented that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p.  in affirmatively representing that the drug given at full dosage would be sold to South Carolina citizens at various dates, but breached such promises repeatedly since June 2009;

q.  in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r.  in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

s.  in that the Defendants failed to adequately, properly, and timely test the diluted dose prior to use;

t.  in that the Defendants  manufactured and sold Fabrazyme®, given at diluted

dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

u. in that the Defendants knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

v. in that the Defendants manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w. in that the Defendants knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the recommended dose;

x. in that the Defendants knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y. in that the Defendants did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users of known or knowable dangers;

z. in that the Defendants did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa. in that the Defendants willfully included an incorrect and unapproved product insert that does not apply to a diluted dosage;

bb. in that the Defendants knew or should have known that physicians and users were relying upon the expertise of the Defendants in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

cc. in that the Defendants expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

dd. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

340. By its actions, Defendants are liable for the severe injuries and conditions of Plaintiff Willette Toby Wehunt, as set forth herein in Count XXVIII.

341. As a direct and proximate result of the aforesaid injuries, Willette Toby Wehunt has suffered damages, as set forth herein in Count XXVIII.

WHEREFORE, Plaintiff Willette Toby Wehunt demands judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine jointly and severally in an amount in excess of $75,000.00.   <u>JURY TRIAL DEMANDED</u>.

**COUNT XXIX: SOUTH CAROLINA UNFAIR TRADE PRACTICES STATUTE VIOLATION (S.C. Code Ann. § 39-5-10 *et. seq.*)**
**WILLETTE TOBY WEHUNT v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE**

342.   Paragraphs 1 through 341 are incorporated hereunder as though fully set forth at length.

343.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or egregious practices

   a.   in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

   b.   in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

   c.   in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

   d.   in affirmatively representing that the drug given at full dosage every two weeks would be sold to South Carolina citizens at various dates, but breached such promises repeatedly since June 2009;

   e.   in barring South Carolina physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring South Carolina Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

   f.   in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

344.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff Willette Toby Wehunt, as set forth herein in Count XXIX.

345.   As a direct and proximate result of the aforesaid injuries, Willette Toby Wehunt has suffered damages, as set forth herein in Count XXIX.

   WHEREFORE, Plaintiff Willette Toby Wehunt demands judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount

in excess of $75,000.00, together with treble damages and costs of suit.   JURY TRIAL DEMANDED.

### COUNT XXX: VIRGINIA CONSUMER PROTECTION ACT VIOLATION (VA. CODE § 59.1 *et seq.*)
### LYNSEY CALLAHAN; CHASTITY JOHNSON; PLAINTIFF D.J.; PLAINTIFF S.J.; DAMON LAFORCE; TERESA VIERS; AND JOSEPH WALLACE, v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

346.   Paragraphs 1 through 345 are incorporated hereunder as though fully set forth at length.

347.   All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

  a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;
  b.  in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;
  c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;
  d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Virginia citizens at various dates, but breached such promises repeatedly since June 2009;
  e.  in barring Virginia physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Virginia Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and
  f.  in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

348.   By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Lynsey Callahan, Chastity Johnson, Plaintiff D.J., Plaintiff S.J., Damon LaForce, Teresa Viers, and Joseph Wallace, as set forth herein in Count XXX.

349.    As a direct and proximate result of the aforesaid injuries of Plaintiffs Lynsey Callahan, Chastity Johnson, Plaintiff D.J., Plaintiff S.J., Damon LaForce, Teresa Viers, and Joseph Wallace have suffered damages as set forth herein in Count XXX.

WHEREFORE, Plaintiffs Lynsey Callahan, Chastity Johnson, Plaintiff D.J., Plaintiff S.J., Damon LaForce, Teresa Viers, and Joseph Wallace demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit. <u>JURY TRIAL DEMANDED</u>.

### COUNT XXXI: VIRGINIA PROHIBITION OF FALSE ADVERTISING VIOLATION (VA. CODE § 59.1 *et seq.*)
### LYNSEY CALLAHAN; CHASTITY JOHNSON; PLAINTIFF D.J.; PLAINTIFF S.J.; DAMON LAFORCE; TERESA VIERS; AND JOSEPH WALLACE v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

350.    Paragraphs 1 through 349 are incorporated hereunder as though fully set forth at length.

351.    All of the resultant losses, damages and injuries sustained by Plaintiffs resulted directly and proximately from Defendants Genzyme's and Mount Sinai's acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

    a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

    b.  in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

    c.  in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg <u>every two weeks</u> as detailed in the label;

    d.  in affirmatively representing that the drug given at full dosage every two weeks would be sold to Virginia citizens at various dates, but breached such promises repeatedly since June 2009;

    e.  in barring Virginia physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Virginia Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with

the indications of the product insert; and

    f.  in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

352.    By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiffs Lynsey Callahan, Chastity Johnson, Plaintiff D.J., Plaintiff S.J., Damon LaForce, Teresa Viers, and Joseph Wallace, as set forth herein in Count XXXI.

353.    As a direct and proximate result of the aforesaid injuries of Plaintiffs Lynsey Callahan, Chastity Johnson, Plaintiff D.J., Plaintiff S.J., Damon LaForce, Teresa Viers, and Joseph Wallace have suffered damages, as set forth herein in Count XXXI.

WHEREFORE, Plaintiffs Lynsey Callahan, Chastity Johnson, Plaintiff D.J., Plaintiff S.J., Damon LaForce, Teresa Viers, and Joseph Wallace demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit. <u>JURY TRIAL DEMANDED</u>.

## COUNT XXXII: WASHINGTON UNIFORM DECEPTIVE TRADE PRACTICES ACT VIOLATION (RCW § 19.86.010 *et seq.*)
### JOY BEADNELL v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

354.    Paragraphs 1 through 3534 are incorporated hereunder as though fully set forth at length.

355.    All of the resultant losses, damages, and injuries sustained by Plaintiff resulted directly and proximately from Defendants Genzyme's and Mount Sinai's deceptive acts or practices regarding the sale and use of Fabrazyme®, generally, and in the following particulars:

    a.  in intentionally failing to inform the Plaintiffs that the dosage given was unapproved and unauthorized and the possible consequences of such unapproved and unauthorized use, despite having warned European patients of such dangers and recommended full dose treatment;

b. in affirmatively representing that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from use of a diluted dose;

c. in willfully placing a misleading and incorrect label with the product since Genzyme substantively banned all patients in the U.S. from receiving the FDA approved dosage of 1mg/kg every two weeks as detailed in the label;

d. in affirmatively representing that the drug given at full dosage every two weeks would be sold to Washington citizens at various dates, but breached such promises repeatedly since June 2009;

e. in barring Washington physicians from administering the prescribed and lawful recommended dose of Fabrazyme® and barring Washington Fabry patients from receiving an FDA approved dose as mandated by the FDA and in accordance with the indications of the product insert; and

f. in expressly or impliedly misrepresenting that the diluted dose and further that the adulterated Fabrazyme® was provided in accordance with statutory mandates and safe and efficacious for use in treating Fabry disease despite having overwhelming knowledge to the contrary.

356. By the use of deceptive trade practices, Defendants are liable for the severe injuries and conditions of Plaintiff Joy Beadnell, as set forth herein in Count XXXII.

357. As a direct and proximate result of the aforesaid injuries of Plaintiff, Joy Beadnell has suffered damages, as set forth herein in Count XXXII.

WHEREFORE, Plaintiff Joy Beadnell demands judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit. JURY TRIAL DEMANDED.

## COUNT XXXIII: WASHINGTON PRODUCT LIABILITY ACT VIOLATION
### (R.C.W. § 7.72 *et seq.*)
### JOY BEADNELL v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE

358. Paragraphs 1 through 357 are incorporated hereunder as though fully set forth at length.

359. All of the resultant losses, damages and injuries sustained by Plaintiff resulted directly and proximately from Defendants' practices regarding the manufacture, sale, contract for sale, and use of the drug, Fabrazyme®, generally, and in the following particulars:

a. in that the Defendants failed to take reasonable steps to avoid and prevent viral

contamination in the Genzyme Allston, MA plant;

b. in that the Defendants failed to take reasonable steps to maintain inventories and capital sufficient to mitigate foreseeable manufacturing shortages;

c. in that the Defendants failed to take reasonable steps to avoid and prevent contamination of Fabrazyme® vials with particulate steel, glass and rubber;

d. in that the Defendants manufactured and sold defective Fabrazyme® vials contaminated with virus, glass, rubber and steel particles;

e. in that the Defendants unilaterally devised, and willfully implemented, the Genzyme Rationing Plan, and otherwise reduced the dose of Fabrazyme® or denied it entirely for treatment of Fabry patients despite physicians (including those employed by Defendant Mount Sinai) recommending a lawful and approved dose;

f. in that the Defendants designed and implemented the Genzyme Rationing Plan despite a contractual duty, an assumed duty, and statutory duty to ensure that Fabrazyme® was made available to all U.S. citizens equally and at the required dose pursuant to the Bayh-Dole Act's prohibition against non-use or unreasonable use of publically funded inventions under 35 U.S.C § 200, specifically U.S. Patent No. 5,356,804;

g. in that the Defendants instructed physicians and patients to use a reduced the dose of Fabrazyme® that was dangerous, sub-efficacious and was not in compliance with the United States food and drug administration's approval at the time the drug left the control of the manufacturer or seller;

h. in that the Defendants barred physicians from administering the prescribed and lawful recommended dose of Fabrazyme® in accordance with the indications of the product insert;

i. in that the Defendants failed to test or require the testing or report the effects of reducing the dosage of Fabrazyme® to unapproved levels to treat Fabry disease;

j. in that the Defendants failed to provide adequate warnings, cautions and directions concerning the dangers and limitations of the diluted dosage of Fabrazyme®;

k. in that the Defendants failed to provide or require proper and adequate reserves of unadulterated Fabrazyme® in order to prevent or mitigate manufacturing errors;

l. in that the Defendants failed to provide or license a second source of manufacture for Fabrazyme® in order to prevent or mitigate life-threatening supply chain disruptions;

m. in that the Defendants failed to inform the Plaintiffs that the dosage given was unapproved and unauthorized as well as the observed or possible consequences of such unapproved and unauthorized use;

n. in that the Defendants affirmatively represented that the drug given at diluted dosage and further contaminated with virus, glass, rubber and steel particles will successfully treat Fabry disease and Fabry disease patients will benefit from such use;

o. in that the Defendants expressly or impliedly misrepresented that the diluted dose and adulterated Fabrazyme® was in accordance with statutory mandates, administrative reporting requirements and otherwise efficacious for use;

p. in affirmatively representing that the drug given at full dosage would be sold to

Washington citizens at various dates, but breached such promises repeatedly since June 2009;

q. in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® reduces globotriacylceramide deposition in capillary endothelium of the kidney and certain other cell types, despite never having tested whether the product at these doses was efficacious and having observed that such dosing does not reduce such deposition;

r. in that the Defendants expressly warranted in the Fabrazyme® product insert that Fabrazyme® is indicated for use to treat Fabry disease, despite never having obtained FDA approval for using lowered dose for such an indication;

s. in that the Defendants failed to adequately, properly, and timely test the diluted dose prior to use;

t. in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated with glass, steel, and rubber particles, which is not fit for the ordinary purpose for which it is customarily or foreseeably used;

u. in that the Defendants knew or should have known that the adulterated drug and diluted dosage of Fabrazyme® is dangerous and likely to cause damage to users;

v. in that the Defendants  manufactured and sold Fabrazyme®, given at diluted dosage and further being adulterated, which was not of merchantable quality and was not in conformity, insofar as safety is concerned, with products used in a normal course of business as well as statutory mandates;

w. in that the Defendants knew or should have known that in order to make Fabrazyme® effective for its intended use, it should have provided the drug at the recommended dose;

x. in that the Defendants  knew or should have known, that due to the inherently dangerous nature of the design of the dosing schedule as well as the drug adulteration, it should have provided warnings on the product to protect users;

y. in that the Defendants did not keep abreast of the state of the art in the science and knew of adverse events involving diluted dosage and failed to warn physicians and users of known or knowable dangers;

z. in that the Defendants did not disclose to the physicians and users that the dosing was defectively and unreasonably designed, thereby making the product dangerous to use;

aa. in that the Defendants willfully included an incorrect and unapproved product insert  that does not apply to a diluted dosage;

bb. in that the Defendants knew or should have known that physicians and users were relying upon the expertise of the Defendants in designing, fabricating, manufacture, testing, labeling as well as supplying Fabrazyme®;

cc. in that the Defendants expressly and impliedly warranted that a lowered dose of Fabrazyme® was approved for use by the FDA and efficacious for use in the treatment of Fabry disease; and

dd. in otherwise failing to exercise the care and caution that a reasonable, careful and prudent entity would have or should have exercised under the circumstances.

360. By its actions, Defendants are liable for the severe injuries and conditions of Plaintiff Joy Beadnell, as set forth herein in Count XXXIII.

361.    As a direct and proximate result of the aforesaid injuries, Joy Beadnell has suffered

damages, as set forth herein in Count XXXIII.

WHEREFORE, Plaintiff Joy Beadnell demands judgment against Defendants Genzyme

Corporation and Mt. Sinai in an amount in excess of $75,000.00, together with punitive

damages, and costs of suit.   JURY TRIAL DEMANDED.

### COUNT XXXIV: BREACH OF THIRD PARTY BENEFICIARY CONTRACT UNDER NEW YORK LAW

**PHILIP ADAMO; JAMES BEADNELL; JOY BEADNELL; PATRICIA BEEN; MERCEDES BEEN; JAMES BISHOP; KRISTINA BOHANNON; STEPHANIE BRIONES; PLAINTIFF J.B.; PLAINTIFF I.B.F.; PLAINTIFF I.B.M.; LYNSEY CALLAHAN; TONI CORDOVA; JOHN CORTINA; SIRO CORTINA; GINA DECOTIIS; ADAM DIBLE; LINDA DURKIN; CAROL E. EMERSON; ROSS FREDERICKSON; EUGENE GNIDOVEC; MICHAEL GNIDOVEC; PHIL HEIDRICK; MARY HELTON; PLAINTIFF D.H.; PLAINTIFF B.H.; SHERYL HUGHES; JEANNETTE HYATT; KEVIN HYATT; MARGARET HYATT; CHASTITY JOHNSON;   PLAINTIFF D.J.; PLAINTIFF S.J.; MICHAEL KILLUPS; ANGELA KING; DAMON LAFORCE; RONALD LECOMTE; MICHAEL LEZON; CHRIS LONG; CAROLYN LUBKER; JAMES MATTHEWS; SCOTT PATRICK;  GARRETT RAWINSKY; JON RAWINSKY; COURTNEY REDDICK; MEGAN SHEFKE; BRADFORD STEVENS; LINDA STRANGE; MICHAEL SICO; TERESA VIERS; JOSEPH WALLACE;  WILLETE TOBY WEHUNT; SHASHONE WEISE; PLAINTIFF B.W.; LAURA WINCHESTER; TRINA WILKINS; PLAINTIFF N.L.; SANDRA WILKINS; JASON WROBLESKI; AND MARC WROBLESKI v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE**

362.    Paragraphs 1 through 361 are incorporated hereunder as though fully set forth at length.

363.    The contract entered into between Genzyme and Mount Sinai expressly provides on its

face that Fabry patients are the intended beneficiaries of the contract.  *See* Exhibit A,

*supra.*

364.    The contract entered into between Genzyme and Mount Sinai expressly states that Mount

Sinai licenses U.S. Patent No. 5,356,804 to Genzyme "to have recombinant x-

galactosidase A developed and made available for general use to patients for the

treatment of Fabry Disease and for these purposes is willing to grant an exclusive license

to GENZYME upon the terms and conditions set forth below." *Id.*

365.   Genzyme has breached the contract with Mount Sinai by failing to make recombinant x-galactosidase A available for general use to patients by restricting access of U.S. patients to the Fabrazyme® for over two years, as of this filing.

366.   The breach has led to patients being untreated or improperly treated for Fabry disease, with Genzyme's full knowledge of this consequence.

367.   It would have been reasonably foreseeable by Genzyme that third party beneficiary Fabry patients would be significantly harmed by the breach.

368.   As a proximate result of Genzyme's breach of contract, third party beneficiary Fabry patients have suffered damages and losses.

369.   As a proximate result of the breach of contract by Genzyme, third party beneficiary Fabry patients will continue to suffer damages and losses.

370.   As a direct and proximate result of the breach, the Plaintiffs have sustained or are at imminent risk of sustaining the following foreseeable serious injuries, some or all which may be of a permanent nature:

　　　　a.　　　renal injury;
　　　　b.　　　cardiac injury;
　　　　c.　　　neurological injury;
　　　　d.　　　peripheral pain;
　　　　e.　　　chronic abdominal pain and diarrhea;
　　　　f.　　　impairment of vision;
　　　　g.　　　impairment of hearing;
　　　　h.　　　increased severity and likelihood of infusion reactions, and
　　　　i.　　　premature death and other serious and permanent injuries.

371.   As a direct and foreseeable result of the aforesaid injuries, Plaintiffs have been damaged as follows:

　　　　a.　　　Plaintiffs have been and will be required to expend large sums of money for medical and surgical attention, medical and surgical supplies, medical and surgical appliances, and medicines;

b.    Plaintiffs have suffered and will continue to suffer great pain, suffering, inconvenience, impairment of bodily function, and mental anguish;

c.    Plaintiffs have been and will be deprived of earnings and earning capacity;

d.    Plaintiffs have suffered loss of enjoyment of life;

e.    Plaintiffs have died or suffered a reduced life expectancy; and

f.    Plaintiffs' general health, strength and vitality have been impaired.

WHEREFORE, Plaintiffs Philip Adamo, James Beadnell, Joy Beadnell, Patricia Been, Mercedes Been, James Bishop, Stephanie Briones, Plaintiff J.B., Kristina Bohannon, Plaintiff I.B.F., Plaintiff I.B.M., Lynsey Callahan, Toni Cordova, John Cortina, Siro Cortina, Gina DeCotiis, Adam Dible, Linda Durkin, Carol E. Emerson, Ross Frederickson, Eugene Gnidovec, Michael Gnidovec, Phil Heidrick, Mary Helton, Plaintiff B.H. , Sheryl Hughes, Jeannette Hyatt, Kevin Hyatt, Margaret Hyatt, Chastity Johnson,   Plaintiff D.J.,  Plaintiff S.J., Michael Killups, Angela King, Damon LaForce, Ronald Lecomte, Michael Lezon, Chris Long, Carolyn Lubker, James Matthews, Scott Patrick, Garrett Rawinsky, Jon Rawinsky, Courtney Reddick, Megan Shefke, Bradford Stevens, Linda Strange, Michael Sico, Teresa Viers, Joseph Wallace, Willete Toby Wehunt, Shashone Weise, Plaintiff B.W., Laura Winchester, Trina Wilkins, Plaintiff N.L., Sandra Wilkins, Jason Wrobleski, and Marc Wrobleski demand judgment against Defendants, Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally for damages caused by the contractual breach, for consequential and incidental damages and for and award of prejudgment interest in an amount in excess of $75,000.00, together with costs of suit as well as an award of such other and further legal or equitable relief this court deems just and proper.

JURY TRIAL DEMANDED.

## COUNT XXXV: LOSS OF CONSORTIUM

**KEITH BEEN; LISA BISHOP; ANNE MARYE BRODBECK; KIMBERLY BUNDRIDGE; JILL CORTINA; ITALIA CORTINA; MARK DECOTIIS; ELIZABETH GNIDOVEC; BRADLY HUGHES; SHERYL HUGHES; SHANNON HYATT; JAMES HYATT; JEREMY JOHNSON; LISA KILLUPS; STEVEN KING; CYNTHIA LECOMTE; MEAGAN LONG; MELISSA PATRICK; DAVID SHEFKE; DOUGLAS**

**STRANGE; JOANNE SICO; EDDIE VIERS; JEANNE WALLACE; DAVID WEHUNT; DAVID WEISE v. GENZYME CORPORATION AND MOUNT SINAI SCHOOL OF MEDICINE**

372.   Paragraphs 1 through 371 of the Complaint are incorporated as if set forth fully at length herein.

373.   As a direct and proximate result of the injuries sustained by their spouses, Plaintiffs have been damaged as follows:

   a.   Plaintiffs have been and will continue to be compelled to expend large sums of money for medical care, supplies, appliances, and medicine;

   b.   Plaintiffs have been and may be compelled to expend large sums of money for hiring help to perform household duties previously performed by their spouses; and

   c.   Plaintiffs have been and will be deprived of their spouse's aid, comfort, assistance, companionship, and consortium.

WHEREFORE, Plaintiffs Keith Been, Lisa Bishop, Anne Marye Brodbeck, Kimberly Bundridge, Jill Cortina, Italia Cortina, Mark Decotiis, Elizabeth Gnidovec, Bradly Hughes, Sheryl Hughes, Shannon Hyatt, James Hyatt, Jeremy Johnson, Lisa Killups, Steven King, Cynthia Lecomte, Meagan Long, Melissa Patrick, David Shefke, Douglas Strange, Joanne Sico, Eddie Viers, Jeanne Wallace, David Wehunt, and David Weise, demand judgment against Defendants Genzyme Corporation and Mount Sinai School of Medicine, jointly and severally in an amount in excess of $75,000.00, together with treble damages and costs of suit.

## JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

a.  Certification of this action or common issues herein as a class action;

b.  A determination of common issues and claims in a unitary, consolidated or class-wide trial pursuant to Fed. R. Civ. P. 23 and/or Fed. R. Civ. P 42;

c.  An award of compensatory damages to each injured class member in an amount deemed appropriate by the trier of fact;

d.  An award of punitive damages for acts and omissions of Defendants found to be willful and wanton, outrageous, and with reckless indifference to Plaintiffs' health and interests;

e.  An award of compensatory, equitable and/or restitutionary damages according to proof and for all applicable damages, remedies, and relief under applicable federal and state statutes;

f.  An award of costs of suit; and

g.  Any other and further legal and/or equitable relief to which Plaintiffs might be entitled at law or which this Court deems proper.

Respectfully submitted,

Plaintiffs, by theirs attorneys,

/s/ Anthony R. Zelle
Anthony R. Zelle (BBO #:548141)
Zelle McDonough & Cohen, LLP
101 Federal Street, 14th floor
Boston, MA 02110
Ph: 617-742-6520
tzelle@zelmcd.com

Matthew L. Kurzweg, Pa.I.D. 76462
C. Allen Black, Jr., Pa.I.D. #202501
Kurzweg Law Offices
First and Market Building
100 First Avenue, Suite 850
Pittsburgh, PA 15222
drallenblack@verizon.net
mkurzweg@kurzweglaw.com